UNITED STATES

v.

**Armando ROJAS, 154 56 4838, Lance Corporal (E–3), U.S. Marine Corps.**

**NMCM 81 2019.**

U. S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 30 Jan. 1981.

Decided 23 Feb. 1983.

MAJ Joseph M. Poirier, USMC, Appellate Defense Counsel.

LT Judith Schevtchuk Robinson, JAGC, USNR, Appellate Defense Counsel.

MAJ Charles Wm. Dorman, USMC, Appellate Government Counsel.

LT(jg) Lyle H. Bowen, Jr., USNR, Under Supervision of Appellate Government Counsel.

Before ABERNATHY, Senior Judge, and KERCHEVAL and BARR, JJ.

ABERNATHY, Senior Judge:

In the summer of 1980 at Camp Lejeune, North Carolina, the partially decomposed body of a young Marine, Private First Class (PFC) St. Onge, was found in the trunk of a car. A confession was soon obtained from PFC Reyers which implicated appellant. The appellant was tried by general court-martial composed of officer and enlisted members upon charges of conspiracy to commit premeditated murder, premeditated murder, larceny of some money in the victim's possession, solicitation to commit murder and solicitation to become an accessory after the fact of murder, violations of Articles 81, 118, 121 and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 918, 921, 934, respectively. Appellant pled guilty to the charges of conspiracy and murder, but application of Article 45(b), UCMJ, 10 U.S.C. § 845(a), prevented the court from receiving the pleas as entered. After extensive evidence, appellant was convicted of all charges and sentenced to reduction to E–1, total forfeitures, and death. By implication, a sentence to death carries a dishonorable discharge. Paragraph 126a, *Manual for Courts-Martial, 1969 (Rev.)* (MCM). Appellant now asserts nine errors for our consideration. We shall discuss these assignments separately, but first, a summary of the facts surrounding the offenses is in order.

A one-time roommate of the appellant testified that the victim had loaned appellant $200.00, allegedly to pay for an illicit drug debt incurred by the latter. Appellant agreed to pay the victim $250.00 on the following payday. Appellant's roommate personally observed the cash change hands. A few weeks later, the victim became adamant about collecting his loan. This determination may have manifested itself as a death threat scrawled on appellant's door.

PFC Reyers had known appellant for about one month before the offense. During this time, appellant offered Reyers a job as a hit man with appellant's "underworld family" in New York. Appellant's embellishment of his life-style apparently attracted Reyers' attention and convinced him that the appellant had bona fide connections with organized crime. The appellant told Reyers, however, that before he could secure the position, he must be tested. Appellant apparently told Reyers that there was a certain Marine whom the appellant was going to kill and that Reyers would be needed to drive a car. Appellant informed Reyers that this Marine was blackmailing him and his family, and showed PFC Reyers the word "DEATH" etched on his door.

Appellant awoke Reyers one morning to tell him that the Marine in question would be coming to his room shortly and instructed PFC Reyers to be present in the appellant's room about fifteen minutes before the victim's arrival. The appellant and PFC Reyers were alone in the barracks room for a short time during which appellant explicitly instructed Reyers to hide behind the front door and strike the victim behind the head with nunchukas, a martial arts weapon. About this time there was a knock on the door from PFC Perry, a longtime friend and roommate of PFC Reyers. When another knock on the door followed, appellant told PFC Perry to go to the head located within the barracks room. Appellant thereafter opened the door and invited PFC St. Onge to enter. PFC Reyers kicked the door shut and struck St. Onge behind the head, as previously instructed, knocking him to the floor.

The victim asked appellant, "What's the matter?" Without responding, appellant nodded to PFC Reyers, who hit St. Onge once more. The victim leaped for the barracks room window in an attempt to escape to the building catwalk. Appellant grabbed the victim and threw him back into the room as PFC Perry emerged from the head. Perry then left the room, apparently think-ing the ruckus was merely a "blanket-party." Appellant then tried to pin the victim to the ground saying, "You die." PFC St. Onge replied, in effect, that he was kidding about the money and the threat scrawled on appellant's door. Appellant, however, was not deterred.

PFC St. Onge again broke free of the struggle and attempted to escape through the window. The appellant grabbed the victim, threw him against the far wall, cracking the victim's head open and smearing blood along the bulkhead. St. Onge appeared dazed as appellant pinned him to the floor and began choking him with his bare hands. The strangulation of St. Onge continued for several minutes, during which the appellant remarked to Reyers that it usually takes about four minutes to choke someone to death. Although St. Onge ceased resistance, appellant continued to strangle him by utilizing the nunchukas and later used a pillow to smother his face. Thereafter, appellant checked for a pulse, and found none as the victim lay motionless with his eyes frozen open. Appellant rifled the victim's pockets and removed approximately $60.00.

The remainder of the record involves testimony which demonstrates convoluted attempts to hide the victim's body, which was first stuffed into a sleeping bag and placed in appellant's wall locker. As the odor of the body became unbearable, appellant secured a car upon innocent pretense and placed the body in the trunk. In the interim period, appellant attempted to solicit another Marine's aid in disposing of the body. The summer heat, natural processes of decomposition, and resultant putrid odors betrayed appellant.

The state of St. Onge's body prevented any accurate, scientific determination of the cause of death beyond a general diagnosis of asphyxiation. As a consequence, the testimony of PFC Reyers was imperative for the government's case against appellant. Based upon that testimony and physical evidence,[1] we are convinced beyond a

---

1. For instance, certain of appellant's issued gear and uniform items were found with the victim's body. Testimony by the owner of the car where the body was hidden and testimony

reasonable doubt that appellant was guilty of the offenses as found by the general court-martial. While the vast majority of appellant's assertions address the sentencing and review phases of trial, Assignment of Error VII more particularly assails the government's case on the merits:

THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT'S SIXTH AMENDMENT RIGHTS WHEN HE GRANTED THE GOVERNMENT'S MOTION *IN LIMINE* RESTRICTING CROSS-EXAMINATION OF APPELLANT'S CO-CONSPIRATOR, THE KEY PROSECUTION WITNESS.

Appellant argues here, as he did at trial, that he was denied his Sixth Amendment right to effective confrontation when the military judge ruled that the terms of PFC Reyers' pretrial agreement and the sentence received by PFC Reyers at his court-martial for these offenses were not appropriate matters for probing Reyers' credibility. We disagree with appellant and begin our analysis with a recitation of the circumstances surrounding this issue.

Appellant asserts that the record of PFC Reyers' general court-martial reveals that the Naval Investigative Service (NIS) had twice interviewed Reyers without obtaining his cooperation. By mid-August, however, Captain (CAPT) Griffis and Major (MAJ) Berry, the designated trial counsel in appellant's case, had succeeded in securing Reyers' confession.

Reyers' date of trial was initially set for 10 October 1980. On 15 October, he was granted testimonial immunity by the officer exercising general court-martial jurisdiction. Appellant's Brief, Appendix IV. On 10 November 1980, PFC Reyers and the convening authority executed a pretrial agreement which in substantial part bound the convening authority to modify the original capital referral of PFC Reyers' general court-martial to non-capital in consideration for PFC Reyers' pleas of guilty to charges of conspiracy to commit premeditated murder and premeditated murder. Also, PFC Reyers' term of confinement at hard labor

was limited to 40 years. The agreement did not contain any reference to requirements for or consequences of PFC Reyers' testimony at appellant's trial. Appellant's Brief, Appendix V. On 24 November, PFC Reyers was found guilty, according to his pleas as noted. MAJ Berry testified in extenuation and mitigation for PFC Reyers. Two days later, prosecutors in appellant's trial requested that PFC Reyers' testimonial immunity be revoked; the request was granted. Appellant's Brief, Appendix VI. The prosecutors simultaneously filed with the court to which appellant's case had been referred, a motion for appropriate relief in the nature of a motion *in limine* to exclude any evidence of PFC Reyers' sentence or the terms of his pretrial agreement. The military judge granted this motion, but reserved the right to modify or rescind that ruling should a subsequent Article 39(a), UCMJ, 10 U.S.C. § 839(a), session which would specifically address the issue of PFC Reyers' credibility *vis a vis* the plea bargain, reveal facts suggesting that it was prematurely granted.

Several days later, the anticipated Article 39(a) session was held to permit the defense to establish any possible relevance of Reyers' pretrial agreement as a factor affecting his credibility. In response to the military judge's opinion that the mere existence of an agreement did not *a fortiori* establish its relevance for purposes of examination on the issue of credibility, defense counsel argued that the agreement, when coupled with the withdrawn immunity, were sufficient to imply a personal motive on the part of Reyers to protect his original story and that such an implication should, accordingly, be presented to the members. The effect of the misconduct clause in Reyers' pretrial agreement, especially should he commit perjury at appellant's trial, was also advanced by defense counsel as a factor relevant to Reyers' credibility. The testimony elicited from Reyers at the Article 39(a) session revealed, among other considerations, that: (a) after talking with his attorneys, he decided to testify without a

of PFC Perry also strongly corroborated the

testimony of PFC Reyers.

grant of immunity in order to enhance his opportunity for clemency; (b) the pretrial agreement had no effect upon his decision to testify; (c) he was willing to testify without the benefit of a pretrial agreement or a grant of immunity "to set the record straight" and enhance his chance for clemency; and, (d) he understood the potentially adverse relationship between the misconduct clause in his pretrial agreement and providing false testimony at appellant's trial. (ROT 634–639).·

The military judge ruled that defense cross-examination in this area would be limited to disclosing:

(1) the fact that Reyers had been convicted;

(2) the offenses for which Reyers was convicted;

(3) that Reyers was testifying "to set the record straight;"

(4) that he hoped for clemency as a result of his testimony; and,

(5) his awareness that he could be prosecuted for perjury and that the misconduct clause of his pretrial agreement might be invoked, threatening his plea bargain.

Defense counsel registered objection to this ruling, thereby preserving the issue for our consideration. We note further that, upon the staff judge advocate's recommendation, Reyers' confinement at hard labor was subsequently reduced from 40 to 35 years based upon his cooperation during appellant's trial.

Appellant asserted at trial that Mil.R. Evid. 609 permits the admission of evidence on the quantum of Reyers' punishment as well as evidence of the conviction itself. It is clear that Mil.R.Evid. 609 allows a witness to be impeached by evidence of a conviction, and here, Reyers' conviction for premeditated murder and conspiracy met all the threshold requirements of Mil.R. Evid. 609 [2] Nowhere, however, does Mil.R. Evid. 609 expressly provide that the details of the witness' sentence be admitted.

▪ Some federal jurisdictions have established a general rule that the cross-examiner should limit his questions concerning prior crimes to the number of prior convictions, the nature of each of the crimes, and the date and time of each conviction. This rule was formulated to insure that when an accused takes the stand evidence of prior convictions would be considered only for impeachment purposes and not to prove general bad character. The rule is also designed to prevent prejudicial confusion of the issues. *See generally United States v. Tumblin,* 551 F.2d 1001, 1004 (5th Cir.1977); Saltzburg, Schinasi, and Schleuter, Military Rules of Evidence Manual 295–96 (1981). The latter of these considerations is reflected in *United States v. Varacalle,* 4 M.J. 181 (C.M.A.1978), holding that matters of punishment for co-conspirators are not relevant to individualized punishment and only serve to confuse the issues. In *United States v. Ragins,* No. 78 1258 (N.C.M.R. 25 September 1979), and under circumstances very similar to those presented in this case, the terms of a co-conspirator's plea bargain were held to not be a matter appropriate for members' consideration in the assessment of credibility.[3] We find the reasoning of *Ragins* and the Fifth Circuit persuasive and, therefore, hold that Mil.R.Evid. 609 is not authority for admitting evidence of the details of a witness' sentence from a prior conviction. Still, there remains the matter of Reyers' potential bias, the extent of his cross-examination in that area, and their relation to appellant's constitutional right to confrontation.

**2.** *See* Mil.R.Evid. 609(a), (b), and (c).

**3.** In *United States v. Ragins,* No. 78 1258 (N.C. M.R. 25 September 1979), the government's chief witness was a civilian co-conspirator of the accused involved in the larceny of foodstuff from the commissary. The witness testified pursuant to a plea bargain in exchange for reducing multiple charges to a single count indictment. We ruled that sufficient latitude for presenting impeachment evidence existed without exposing the actual terms of the agreement. The military judge had found that it was appropriate to allow impeachment by showing that the charges were reduced, but it was not appropriate to bring out exactly what sentence the witness could expect. We agreed.

"There are few subjects, perhaps upon which [the Supreme] Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas*, 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965).

■ It is generally recognized that the exposure of possible motivations for false testimony is a fundamental element of cross-examination as protected and guaranteed by the confrontation clause. Thus, cross-examination into any motive or incentive a witness may have for falsifying his testimony must be permitted. *See Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); see Mil.R.Evid. 608(c). Federal and military cases recognize that such cross-examination is especially important in a case where a witness or accomplice may have substantial reason to cooperate with the government; this is even more so where the witness provides an essential link in the government's case, as a "star" witness, so to speak. *See generally United States v. Albright*, 9 USCMA 628, 631, 26 CMR 408, 411 (1958); *United States v. Saylor*, 6 M.J. 647 (N.C.M.R.1978); *United States v. Garrett*, No. 77 1195 (N.C.M.R. 27 January 1978); *United States v. Sharp*, No. 76 1554 (N.C.M.R. 28 February 1977); *United States v. Toby*, No. 69 1674 (N.C.M.R. 29 August 1969); *see also United States v. Summers*, 598 F.2d 450, 460 (5th Cir.1979); *United States v. Mayers*, 556 F.2d 245 (5th

Cir.1977); *United States v. Pfeiffer*, 539 F.2d 668, 671 (8th Cir.1976); *Farkas v. United States*, 2 F.2d 644, 647 (6th Cir. 1924), and cases cited therein. Indeed, some civilian jurisdictions consider this right so important under these circumstances that an accused may be permitted, through cross-examination, to *"search"* for an agreement between the government and the witness. *See Greene v. Wainwright*, 634 F.2d 272, 276 (5th Cir.1981)[4] (emphasis added).

■ The Sixth Amendment right of confrontation and cross-examination is not, however, without limit. The matters sought to be pursued must be relevant to, and thus be probative of, some proper issue before the court. With this framework as a guide, a trial judge possesses the discretion to limit the scope and extent of cross-examination, so long as an accused's right of confrontation is not impinged upon. *See United States v. Hall*, 653 F.2d 1002, 1007–08, (5th Cir.1981); *United States v. Elliott*, 571 F.2d 880 (5th Cir.1978).

■ Unless a ruling by the trial judge has completely foreclosed a line of questioning allowable as a matter of right, it is often difficult to determine where falls the line of demarcation between permissible restriction on, versus the abridgement of, the constitutional right of cross-examination. In *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Supreme Court suggested a pragmatic approach to the problem:

4. This wide scope of cross-examination was addressed by the Supreme Court in *Alford v. United States*, 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931):

Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory; and the rule that the examiner must indicate the purpose of his inquiry does not, in general, apply .... It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper set-

ting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them .... To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts, tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial.

This constitutional dimension of the holding in *Alford* has not been affected by subsequent reversal. *Davis v. Alaska*, 415 U.S. 308, 318 n. 6, 94 S.Ct. 1105, 1111 n. 6, 39 L.Ed.2d 347 (1974).

While counsel was permitted to ask [the witness] *whether* he was biased, counsel was unable to make a record from which to argue *why* [the witness] might have been biased ... [T]o make such an inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. Petitioner was thus denied the right to effective cross-examination. *Id.* at 318, 94 S.Ct. at 1111 (emphasis in the original).

The test enunciated in *Davis* provides the legal benchmark for our analysis of the cross-examination of Reyers as to matters concerning his credibility as a witness. The transcript of the cross-examination is most informative:

Q. PFC REYERS, are you testifying here today with immunity?

A. No, sir.

Q. Was there ever an occasion when you did have immunity from the Commanding General?

A. Yes, sir.

Q. Approximately when was that?

A. I think it was in October or November, sir.

Q. And in your mind, what did immunity mean?

A. It means if I testify, whatever I testify to wouldn't be used against me in my court-martial. It wouldn't be used against me in any way, sir.

Q. And approximately until the beginning of December, I believe, the immunity was withdrawn by the General; is that true?

A. I'm not sure when it was, but it was withdrawn.

Q. So, you are testifying freely today?

A. Yes, sir.

Q. Were you ever told by anybody what would happen if you decided not to testify voluntarily.

A. Yes, sir.

Q. And what did they tell you?

A. They said that if I didn't voluntarily testify, that they could get a grant of immunity and then I would have to testify and if I didn't testify then, that I would be subject—I could get another court-martial, sir.

Q. For failure to testify?

A. Yes, sir.

Q. And who told you that?

A. Captain GRIFFIS did and my lawyer Major STRICKLAND, sir.

Q. Is it your hope that by testifying that you are going to get some kind of clemency later on?

A. I can hope so, sir.

Q. Is that one of your primary reasons to testify?

A. No, sir.

Q. It isn't?

A. No, sir.

Q. What is your primary reason for testifying?

A. I want to set things as straight as I can, sir.

Q. But would you like to hope to get some clemency?

A. Yes, sir.

Q. Have you ever been convicted of any crimes?

A. Yes, sir.

Q. Could you please tell the court what crimes you have been convicted of?

A. I was convicted of conspiracy to commit murder, premeditated murder.

Q. And that was the end of November?

A. I believe so, sir.

Q. PFC, do you realize that if you are not to tell the truth today, that you could possibly be tried for perjury?

A. Yes, sir.

Q. And do you also realize that if you do not tell the truth, there may be some other severe consequences beyond that?

A. Yes, sir.

Q. Do you also realize that if you testified differently from the way you

may have testified under oath before, that you may—that you made before—that you may be possibly subject to prosecution for perjury?

A. Yes, sir.

Q. Now, you did make another statement under oath; is that correct?

A. Yes, sir.

Q. When was that?

A. 19 August, sir.

Q. And that was a confession, I believe?

A. Yes, sir.

Q. And who did you make that confession to?

A. Captain GRIFFIS, and Major BERRY, sir.

Q. The prosecutors in the present case?

A. Yes, sir.

 · · · · ·

(ROT 676–77).

We conclude, based on the revealing testimony given by Reyers at the previously mentioned Article 39(a) session, his cross-examination before the court members, and the legal test for confrontation analysis that the court was sufficiently apprised of all the relevant facts necessary to drawing an informed conclusion concerning Reyers' potential bias. Appellant was given ample exploratory latitude at the Article 39(a) session to reveal any agreements or subjective understandings between Reyers and the government. None was found. Certain other factors must be emphasized which distinguish the facts of this case from cases previously cited: (a) appellant's co-conspirator was already tried and sentenced; (b) the written terms of Reyers' plea bargain did not contain any reference to testimony against appellant; (c) appellant was not testifying under a grant of immunity; (d) examination at the Article 39(a) session did not reveal any evidence, either extrinsically or of a subjective nature, of any underlying "deals"; (e) Reyers' freely admitted hope for clemency was not withheld from the members' consideration; (f) the defense counsel were permitted to argue their theory of bias to the members; and, (g) the

military judge instructed the members to consider Reyers' self-serving interests in testifying as matters which might affect his credibility. Under these circumstances, appellant's right to confront Reyers and to develop a theory of bias which would affect credibility was not impermissibly restricted. Accordingly, we dismiss Assignment of Error VII.

In Assignment of Error VIII, appellant asserts:

THE MILITARY JUDGE ERRED ... BY DENYING THE DEFENSE CHALLENGE FOR CAUSE OF COLONEL RUST AFTER HE TESTIFIED HE WAS PREDISPOSED TO ENTER THE DEATH SENTENCE IN PREMEDITATED MURDER CASES.

The trial judge's concern for the serious magnitude of members' *voir dire* and selection is amply demonstrated within the record. This concern was reflected in the detailed and conscientious manner in which *voir dire* was conducted. Counsel's attention was properly invited to three key Supreme Court cases which address jury selection in capital cases (ROT 82). Wide latitude was permitted counsel to inquire into, among other areas, the members' previous knowledge of the case, their personal biases, and sentence predisposition. During the course of *voir dire*, six challenges for cause were sustained, with the defense exercising one peremptory challenge upon a seventh potential member. In this general background of painstaking, careful and attentive member selection, appellant challenges the trial judge's decision to deny a challenge for cause of the President of the Court, Colonel (COL) Rust. The ground asserted at trial for this challenge was inelastic predisposition toward capital punishment. Appellant now argues that, for the following reasons, the military judge erred:

(1) COL Rust had read newspaper accounts of the crime;

(2) COL Rust had discussed the case with his colleagues;

(3) COL Rust had been appointed a member of the general court-martial in *United States v. Reyers* and had re-

ceived instructions regarding media coverage and court dates;

(4) COL Rust expressed his predisposition for the death penalty three times during *voir dire;*

(5) The defense was permitted and had exercised its sole peremptory challenge;

(6) The military judge improperly intervened to rehabilitate COL Rust;

(7) COL Rust was president of the court-martial, with attendant influence; and,

(8) In a capital case, challenges for cause should be construed liberally.

■ An examination of the details of COL Rust's *voir dire* is in order. We do so with two important considerations in mind: the burden of establishing a valid challenge rests with the party asserting it; *United States v. Chaplin,* 8 M.J. 621 (N.C.M.R. 1979); *United States v. Dilts,* No. 79 1278 (N.C.M.R. 29 April 1980); para. 62*h,* MCM; and the determination of the validity of a challenge for cause must be based upon the *entire voir dire. See United States v. Denno,* 313 F.2d 364 (2d Cir.1963) (emphasis added).

After general examination addressing the nature of the charges, previous experience as a court-martial member, combat service, relationship with the convening authority, legal experience and other unrelated general questions, pertinent *voir dire* of COL Rust occurred as follows:

IMC: Assuming, sir, that Lance Corporal ROJAS is found guilty of premeditated murder, as Major BERRY pointed out, the sentence in that case would be either mandatory life or death, depending upon the jury or the members. Assuming we get to that point, sir, in order for the death penalty to be imposed a unanimous verdict is necessary; by that I mean, all the members would have to vote for the death penalty before it could be awarded by the Court. Do you understand that, sir?

MEM: (RUST) Yes.

IMC: If you felt very strongly that the death penalty was not an appropriate sentence ... penalty in this particular case, could you stick by that feeling even if you were in the minority?

MEM: (RUST) Yes.

IMC: Again, assuming that Lance Corporal ROJAS is found guilty of any offense, there of course would be a sentencing portion of the trial. I believe Captain GRIF-FIS mentioned this earlier. There are often said to be various factors that should be considered by the members when they are deciding on an appropriate sentence. Sometimes these are considered like retributions, rehabilitations, or deterrences. As you sit here now, sir, is there any one factor that stands out in your mind of those factors, or any other factors, that you feel is more important than some others perhaps?

MEM: (RUST) No.

IMC: Do you feel that rehabilitation is a factor that should be considered when deciding on a sentence in the case?

MEM: (RUST) I think it has to be considered along with everything else.

IMC: Do you feel that most individuals can be rehabilitated and returned to society after a number of years in jail?

MJ: The operative word is "Most;" do you feel that most individuals can be rehabilitated. Do you feel that any individual can be rehabilitated; do you feel that all individuals can be rehabilitated? Just generally speaking, whatever your thoughts might be on the subject?

MEM: (RUST) Well, I think I tend to feel that if a person takes a life ...

MJ: Well ...

MEM: (RUST) If proven beyond a reasonable doubt, that there may only be one sentence.

MJ: It may be that the question is not being understood. We are talking now in a very general way and not necessarily about the offense of murder. Just in a general way, do you feel that people can be ... can commit offenses and can go to jail and be rehabilitated?

MEM: (RUST) Yes.

IMC: Do you feel that most people can?

MEM: (RUST) I would say, yes.

IMC: All right, and becoming a little more specific, now, about the offense of murder. If a person were convicted of murder, and let's call it premeditated murder, do you think there is ever an occasion where a person convicted of a premeditated murder, aside from mandatory punishments and so on and so forth, just in a general way, do you think that a person who has committed the offense and been found guilty of the offense of premeditated murder could ever be rehabilitated and returned to society?

MEM: (RUST) I think you have to know the whole story and all the facts. I guess to make that ... but there is a chance that could be the case.

MJ: Asking the same question in a different way; do you think that a person convicted of premeditated murder could ever be rehabilitated and restored to society?

MEM: (RUST) Well, I don't think I could answer that without knowing the facts.

IMC: Can you conceive of a situation where there are factors that would lead you to believe that a person could be restored to society; just in your experience in life? You have seen movies about prison life, and, oh ... I have vague recollections of movies where people were sentenced to life imprisonment and restored, ultimately given a pardon. In real life situations ... many times these movies are based upon real life situations, and again, the question is; can you conceive of some circumstances where people can be restored to society having been convicted of premeditated murder?

MEM: (RUST) Yes, I think I can. That's true.

MJ: All right, excuse me Captain MCNEIL for interrupting. Is there anything that you want to add to that. I don't want to cut you off?

MEM: (RUST) It's different. You have to know the facts and the whole evidence in order to answer some of these questions.

MJ: I understand that.

MEM: (RUST) But, I think that you can, once you have that information. You put it all together in your best ability and you come to a conclusion, you make a decision; but, I think, yes, we see things on television. We see things in life where a person makes a mistake and they can turn their life around.

MJ: Even with the offense of premeditated murder?

MEM: (RUST) I think so, yes.

MJ: All right; Captain MCNEIL?

IMC: Thank you, sir. Sir, Have you ever known anybody who has had an offense ... a court-martial offense, or even a civilian friend who might have been in trouble with the law, or went to a trial; have you ever known anybody like that, somebody that might have worked for you, whether it's a UA offense, or something else?

MEM: (RUST) Yes.

IMC: Have you ever known of any of those individuals, who have been rehabilitated and become good Marines; again, or good civilians and what not?

MEM: (RUST) Yes.

IMC: Do you feel that people can be rehabilitated?

MEM: (RUST) YES.

IMC: After receiving some punishment they can be rehabilitated?

MEM: (RUST) Of course. My experience has been with much lesser serious crimes.

IMC: But, as a general rule of thumb, do you believe that individuals can be rehabilitated?

MEM: (RUST) Yes.

IMC: Sir, if you had a close friend, or relative, who was facing some serious charges, whether it is in the military or civilian life, criminal charges, and it was for you to decide that that person was acquitted or at least had a fair trial, would you want someone sitting on that particular court with the same type of attitudes and feelings that you have?

**914**

MEM: (RUST) I think so, yes.

IMC: Sir, what are your views on capital punishment?

MJ: Just in general terms?

MEM: (RUST) Well, I am against the taking of a life, and I think if a person does that that ... I guess I would have to say, I believe or support capital punishment.

IMC: Do you feel then, if someone takes someone's life, they all should sacrifice their life too; is that your general feeling, sir?

MEM: (RUST) You have got to know ... if convicted, and when you have all the mitigation and extenuation, if that's what it comes down to ... well, that doesn't necessarily have to be ... have to the way it goes. You have got to know the whole facts and all the evidence and make a decision. I would not be against that sentence; but, I would not say that's the only sentence.

IMC: Just a minute, sir; sir, if you felt there was no sufficient justification for a murder, would that make you feel that the death penalty would be appropriate?

MEM: (RUST) If there was no justification?

IMC: Apparent justification, or motive, for a murder; would that make you feel that the death penalty would be appropriate?

MJ: By itself ... if you decided in your mind that there was no justification, of course, that's one of the instructions that you are given with the elements of the offense, that the killing was without justification or excuse. If you decided there was absolutely no justification for this at all, would you feel the death penalty would be the kind of sentence that would be appropriate, or you would take into consideration such matters as age; all that sort of thing?

MEM: (RUST) I think I have to know ... you know, consider everything. I don't think I can say yes or no to that question because you don't know the other things to consider. You would not ... I mean, a robot could sit here and say, yes or no, meet this creature, that is it. That is why I think

we have members. You have got to use your own conscience and weigh all the facts and make a decision. Well, of course, the difficulty we have is trying to feel out our thoughts and feelings on this subject; and of course, it is not easy to do.

MJ: I think the defense counsel's questions is essentially designed to see if you feel that, if the man is convicted with the proof beyond a reasonable doubt of premeditated murder, and there is just no justification; in other words, mitigating circumstances.

IMC: If no excuse whatsoever for having done this, would that cause you to vote for a death sentence?

MEM: (RUST) I think yes, if you say there is no mitigating circumstances, no extenuating circumstances.

MJ: Insofar as, why it was committed. That goes to, for example; considerations about rehabilitation. It may be there was absolutely no excuse, but on the other side, there may be some evidence of good possibilities for rehabilitation. What the defense counsel asked earlier, about bad acts being done by people who are not necessarily bad, that sort of thing; could you consider these other things if you decided in your mind that, insofar as, the act itself was concerned there is absolutely nothing mitigating about it? Again, it is hard to articulate these questions, and I recognize that you haven't heard any evidence and we need to explore, as best we can, what your thinking is?

MEM: (RUST) The question you are asking, I guess I would have to answer that, if the individual was found guilty with no justification, no mitigation, no extenuation, no other circumstances, I would tend to ...

MJ: As to the offenses; as to the offenses, there being however other evidence as to his age, his family, upbringing, religious background, good family, wife, kids, potential for rehabilitation, perhaps expert testimony as to rehabilitation, that kind of thing; do you feel that you could vote in favor of a death sentence?

MEM: (RUST) Well, that gets back now to you knowing more things like ... you have got to consider, and I think I said I couldn't really make that decision until I had all the information. You would have to consider everything; but, that's a pretty ... that's a petty serious thing, when you take another person's life, or vote for that, and I could not do that easily without trying to put every bit of information that was presented here and make the best possible decision I could.

If you say there are no extenuating or mitigation factors, I would say, "Yes, vote for the death sentence," and now you say there is more information and you have to consider everything, everything possible that can be presented, and weigh those things in your mind, and make the best decision you could. Realizing, that even as a member of a Special Court-Martial, when I voted for something, I took that ... this was a serious thing, and it was never anymore than months at the most and a BCD. You are talking about someone's life, and I feel you have got to make the best decision you can, and I would do the best I could based upon all the information.

MJ: Captain MCNEIL, I did not mean to inappropriately cut in. Do you want to explore this further?

MEM: (RUST) You know, I realize, I guess, what you are trying to do. I do support capital punishment, I guess; but, it has got to be ... it has got to be proved beyond a reasonable doubt that that is what the person deserves.

IMC: Could we have a 39a Session, Your Honor?

MJ: Yes. Colonel RUST, could I ask that you go into the back room.

(The member, Colonel RUST, withdrew from the courtroom.)

MJ: Yes, Captain MCNEIL?

IMC: Your Honor, we would like to challenge Colonel Rust for cause at the present time, without any further questions. Certainly, the defense feels in somewhat of a tight situation. Your Honor, if we ask him any more questions he may squeeze out of what he originally was saying, and the initial gist of what he was saying is the defense feels is a strong leaning towards the death penalty when you have a homicide that is proved beyond a reasonable doubt.

He indicated that yes, there would be other considerations; but, he has strongly seemed to lean in the direction, along with like; for example Staff Sergeant DRAPER did, about homicide ... beyond ... death ... and therefore, at this time, we would like to make the challenge.

MJ: All right, what he said was; if it was shown beyond a reasonable doubt that that is what he deserves.

IMC: That is what he said at the end, sir, but before that he indicated right at the outset when this conversation really got involved, so to speak, he indicated if it was proven beyond a reasonable doubt that the individual was guilty of murder, there is maybe only one sentence.

MJ: Well, let me put it to you this way. At this point, I'll not sustain the challenge. I think the government should have an opportunity to ask some questions and I will entertain the challenge again when both sides have completed all their questions. At this point, I don't believe the challenge should be sustained. Anything else before we call Colonel RUST?

IMC: No, sir.

MJ: Would you ask Colonel Rust to return please.

(The member, Colonel RUST, entered the courtroom.)

MJ: Colonel, please be seated again. Further questions Captain MCNEIL?

IMC: Yes, sir. Sir, what kind of ... type of cases does the Colonel feel that the death penalty would be warranted; either the .. obviously murder, I presume; is that correct, sir?

MEM: (RUST) Yes.

IMC: Okay, can you think of any factor ... not factors, but events surrounding the commission that may make you feel that that is the type of situation where a death penalty would be warranted; based upon

your experiences throughout your life of reading homicide situations and in civilian life and in the military or anywhere?

MEM: (RUST) You are saying certain things .. you are asking me, are concerning ... are certain cases would be more for the death penalty than others?

IMC: Yes, sir.

MEM: (RUST) I think ... I am not sure I can say any case should be any more demanding of the death sentence than any other case which a life has been taken.

IMC: So, what you are saying; that when a life has been taken; do you feel that you lean towards the death penalty merely on that fact? I realize that it is a limiting factor, but you continually go back to the fact that when a life is taken, it is very serious, et cetera, when in your mind, when you have a homicide, a murder case, is it your feeling that you lean toward the death penalty at the outset?

MEM: (RUST) I guess the answer is yes, because it gets back to what I say, that I don't ... I don't support, but I believe in capital punishment. I guess, now you are getting ... you are asking before you ... the only thing about it, but I would say initially, yes, that ...

IMC: So, the defense would have to advance ... or the accused would have to kind of convince you to the contrary; isn't that what you are saying, sir?

MEM: (RUST) No, because during the course of the trial, all the information is going to come in there from which I could make a decent decision; but, I don't think you are going to have to convince me. You asked me if my initial feeling if a life was taken a death penalty may be approved. I say, yes, but not to the point that you have got to convince me otherwise. In this particular case, I would hear the facts. All the evidence, everything, together and make a decision. I do not think saying, "convince me" is a proper way to put that.

IMC: Persuaded, sir?

MEM: (RUST) Not .. not even sure persuaded, because I would hear all the information and make the best decision I could based upon what was presented in the court.

IMC: We have a situation here, sir, where the charge sheet, as the Colonel has read, we are talking about premeditated murder, by its very nature we are talking about a planned scheme, so to speak, to commit a murder upon another individual, assuming the government proves premeditated murder, which again, as the military judge indicated, there is no justification for that type of homicide. Would the Colonel feel at that point in time that the death penalty would be appropriate based upon the nature of the type of beast of premeditated murder. I'm not talking about involuntary manslaughter .. homicide, or heat of passion ... a premeditated design to murder someone and carrying out the commission of that crime. Based upon just that one type of observation, is the Colonel predisposed to the death penalty at this time?

MEM: (RUST) I think so, yes.

IMC: We have no further questions.

MJ: Major BERRY?

ATC: Colonel RUST—

MEM: (RUST) Could I ask what ... does he mean before ... that question ... before any other mitigating or extenuating evidence was brought into it does he mean after that?

MJ: I'm not sure what he means. Why don't ... why don't you explain.

IMC: What I am referring to, sir, granted we are talking somewhat of a vacuum situation, but assuming the government proves what is in the charge sheet, and I certainly assume they intend to try to prove that, and believe they can. So, assuming what is in the charge sheet, talking about conspiracy, premeditated murder, assuming they prove all these facts, we have an accused, he is probably found guilty based upon that evidence, and assuming that members find him guilty of a premeditated design to take another Marine's life without any justification, and it being planned, now, without receiving any evidence of his back-

ground, the court, assuming again, has found him guilty of a premeditated design to kill somebody, merely on that point alone, is it your feeling that at that time, you lean toward the death penalty?

MEM: (RUST) Yes.

IMC: You understand, sir, the question?

MEM: (RUST) Yes; you understand that is not saying it is clear cut though in my mind.

MJ: What you are saying is, that you lean towards the death penalty, but the evidence presented on family background, age, experience in life, experience in the Marine Corps; this could tip the scale back?

MEM: (RUST) Yes.

MJ: Towards another sentence?

MEM: (RUST) Yes.

IMC: We have no further questions, sir, at this time.

ATC: Colonel, I realize it is difficult to answer these questions out of context with the facts. Can we presume that your answers to Captain MCNEIL are based upon relatively abstract concepts of this, rather than what the facts and details are of this offense?

MEM: (RUST) Yes, that's just my feeling on this kind of a thing in general. Not this particular case, because I don't know anything hardly about this case.

ATC: When it comes time . . . should it become time to consider a sentence, will you consider the extenuating and mitigating factors brought forward, if any?

MEM: (RUST) Yes.

ATC: Would you keep an open mind on the question of punishment until the very conclusion of this trial?

MEM: (RUST) Yes.

ATC: Would you consider very strongly life imprisonment before considering a death penalty?

MEM: (RUST) I would consider both of them.

ATC: Would you consider all the evidence presented in this case, both by the government and by the defense, and to-gether with instructions of the military judge and adjudge a sentence which is proper and not one which you have already determined in your own mind?

MEM: (RUST) Yes.

ATC: Thank you.

MJ: Anything further, Captain MCNEIL?

IMC: No, sir.

MJ: Thank you, Colonel Rust, and would you return to the back room again.

(At this time the member, Colonel RUST, withdrew to the back of the courtroom.)

■ Empanelling a court-martial of impartial members is a critical aspect of a fair trial, for an accused is entitled to have his sentence as well as his guilt adjudged by court members who are uninfluenced by predetermined and fixed ideas. *See United States v. Cleveland,* 15 USCMA 213, 216, 35 CMR 185, 188 (1965); *United States v. Parker,* 6 USCMA 274, 19 CMR 400 (1955); *United States v. Chaplin,* 8 M.J. 621, 623 (N.C.M.R.1979); Article 41, UCMJ, 10 U.S.C. § 841. Procedures have been established within the military justice system to ensure impartiality. Paragraph 62, MCM. The decision to grant or deny a challenge for cause against a court member is one imparted from Congress to the military judge. While he has reasonable discretion to determine controversies of fact within this realm, the judge has no discretion to ignore applicable legal principles in arriving at a decision on the challenge for cause. *United States v. Harris,* 13 M.J. 288 (C.M.A. 1982). Here, the military judge was obviously aware of controlling principles of law. *See* Record at p. 82.

The seminal case in this area, *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 770 (1968), recognized the unconstitutionality of a death sentence imposed by a jury where members had been excused for cause simply because they expressed general objections to the death penalty or had conscientious or religious scruples against its infliction. There, the state was held to have no valid interest in a broad

based rule of exclusion (or inclusion), since "[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him . . . and thus can obey the oath of a juror." *Id.* at 519, 88 S.Ct. at 1775. "[W]hatever else may be said of capital punishment, it is at least clear that its imposition by a 'hanging' jury cannot be squared with the Constitution." *Id.* at 523, 88 S.Ct. at 1778.

*Witherspoon* established a two pronged test for the state's power to exclude jury members:

(1) That the potential member would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at trial of the case before them, or

(2) That their attitude toward the death penalty would prevent them from making an impartial decision as to an accused's guilt. *Id.* at 522–23, 88 S.Ct. at 1777.

*See generally Williams v. Maggio,* 679 F.2d 381, 383–86 (5th Cir.1982); *Gray v. Lucas,* 677 F.2d 1086, 1098 (5th Cir.1982). The line of cases which follow *Witherspoon*[5] establishes

. . . the general proposition that a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The state may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the Court. *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980).

This test of substantial impairment as applied in capital cases is readily adapted to long-established principles governing member challenges in the military justice system.

The principle is clear that if a court member's *voir dire* answers reflect an inelastic attitude toward the imposition of a punishment which was based solely on the nature of the crime, the military judge is required to sustain a challenge for cause. A mere predisposition to adjudge a particular punishment upon a conviction is not, standing alone, sufficient to disqualify a member. Rather, the test is whether the member's attitude is of such a nature that he will not yield to the evidence presented and the judge's instructions. *United States v. Tippit,* 9 M.J. 106, 107 (C.M.A.1980) (citations omitted). Thus, the test in the military closely parallels that established in *Witherspoon* and its progeny. We shall apply that test to the issues addressed by appellant, which include sentencing predisposition, previous knowledge, and prior discussion of the case. *See generally United States v. McQueen,* 7 M.J. 281 (C.M.A.1979); *United States v. Boyd,* 7 M.J. 282 (C.M.A. 1979).

Under the standard of "inelasticity," there is no indication on the record that COL Rust could not, or would not, yield to the evidence presented and the judge's instructions. While a certain predisposition towards capital punishment existed, there is no indication that it would cause COL Rust to automatically vote for a death sentence without regard to the evidence developed in the case; nor does this predisposition establish an attitude toward capital punishment which would prevent an impartial decision on findings.

There is absolutely no suggestion from the record that COL Rust's reading of a single news item or a brief discussion of that article with workmates affected his impartiality. At best, these incidents demonstrated a casual knowledge of circumstances surrounding the offense no greater than that conveyed by the charges and specifications. Pretrial publicity was not a factor. *See United States v. Calley,* 22 USCMA 534, 537–38, 48 C.M.R. 19, 22–23

---

**5.** *See Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976); *Maxwell v. Bishop,* 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970); *Boulden v. Holman,* 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969).

(1973); *United States v. Russell*, 43 C.M.R. 807 (A.C.M.R.1971), and cases cited therein, As to appellant's remaining assertions, we find no precedent in the law or evidence in the record of trial to support a reversal of the military judge's ruling.[6] Accordingly, Assignment of Error VIII is dismissed.

Appellant asserts one other error which is directed toward the findings portion of trial:

## DENIAL OF EQUAL PROTECTION WHEN CONVICTED BY NON–UNANIMOUS VOTE OF A SEVEN MEMBER PANEL.

■ Appellant's argument addresses the constitutionality of two aspects of courts-martial members trials: (1) the number of members empanelled for trial; and (2), the non-unanimous nature of the verdict. At trial appellant argued that a court composed of less than six members violated the Sixth Amendment right to trial by jury, especially as interpreted by the Supreme Court in *Ballew v. Georgia*, 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978). Appellant reiterates that argument here, additionally asserting that the potential variation in the number of members sitting in courts-martial violates equal protection principles.

These arguments have been offered before this and other Courts of Military Review and have been dismissed. The reasoning employed therein is most persuasive and does not lose its efficacy in the perspective of a capital case. *See United States v. Corl*, 6 M.J. 914 (N.C.M.R.1979), *summarily affirmed*, 8 M.J. 47 (C.M.A.1979); *United States v. Gaines*, No. 80 0413 (N.M.C.M.R. 30 November 1981), *pet. denied*, 13 M.J. 199 (C.M.A.1982); *United States v. Guilford*, 8 M.J. 242 (C.M.A.1980); *United States v. Montgomery*, 5 M.J. 832 (A.C.M.R.1978), *pet. denied*, 6 M.J. 89 (C.M.A.1978). Accordingly, Assignment of Error IV is dismissed.

**6.** We note that appellant requested additional peremptory challenges at trial; this request was properly denied. Although there is some indication of movement toward a change in the limit on peremptory challenges, *see United States v. Harris*, 13 M.J. 288 (C.M.A.1982), es-

## APPROPRIATENESS OF SENTENCE.

■ Sentence appropriateness is determined by the sentencing authority at the trial level, the convening authority and the Court of Military Review. *See* paragraphs 76, 88, and 100, MCM. Generally, sentence appropriateness should be judged by individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and the character of the offender. *United States v. Snelling*, 14 M.J. 267 (C.M.A.1982). Guidelines for the analysis of sentence appropriateness were well established in *United States v. Usry*, 9 M.J. 701 (N.C.M.R.1980).

■ Article 66(c), UCMJ, 10 U.S.C. § 866(c), requires a Court of Military Review to disapprove any sentence which in view of the entire record is not fair and just. While it is recognized that sentencing is not an exact science and that we should strive for uniformity, the sense of justice of the community where the crime was committed should not be disturbed unless the harshness of the sentence is so disproportionate as to cry out for sentence equalization. *United States v. Usry, supra* at 704. Our review of sentences utilizes the general objectives set out in *Standards Relating to Appellate Review of Sentence*, ABA Project on Minimum Standards of Criminal Justice, 1967:

(i) to correct the sentence which is excessive in length, having regard to the nature of the offense, the character of the offender, and the protection of the public interest;

(ii) to facilitate the rehabilitation of the offender by affording him an opportunity to assert grievances he may have regarding his sentence;

(iii) to promote respect for law by correcting abuses of the sentencing

pecially where the serious nature of the case may dictate, we are not in a position to so "legislate." *See United States v. Calley*, 46 C.M.R. 1131 (A.C.M.R.1973); *see also United States v. Hamill*, 23 C.M.R. 827 (A.C.M.R. 1957), and cases cited therein.

power and by increasing the fairness of the sentencing process; and,

(iv) to promote the development and application of criteria for sentencing which are both rational and just.

*United States v. Usry, supra* at 704.

▉ Appellant offered substantial evidence in extenuation and mitigation. At the time of the offense appellant was 20 years old. He had immigrated from Cuba in 1968 and lived in New Jersey until his induction into the Marines. His parents were divorced. Certain defense exhibits show that appellant's average proficiency and conduct marks during his enlistment were 4.4 and 3.4, with one zero conduct marking; he was a member of the Division's drill team; appellant's GCT score is 103 (above average); appellant was a high school graduate with a B(+) average; he had completed nine Marine Corps Institute courses ranging from accounting to Map and Aerial Photo Reading; letters from appellant's school teachers and counselors reflected opinions that appellant was a person of good moral character and was never a serious disciplinary problem; appellant had been advanced from 6th to 8th grade because of excellent school work and had expressed intentions to join the military to secure educational support to attend college. Two commissioned officers who had known appellant for approximately 1–1½ years testified that appellant was an excellent typist who often worked after hours on his own initiative. Appellant's sister testified that during his youth, he was shy, timid and nonviolent.

In appellant's unsworn statement he explained that he had known PFC St. Onge for only ten days, or so, when he received $200.00 from the victim to make a drug purchase. Appellant did not make the purchase and failed to return the money. The victim was upset and when confronted by appellant regarding the death threat on his door, PFC St. Onge admitted responsibility. Appellant stated that another threat was made. The offense occurred later in the same day. The accused stated that he was scared and had no justification for the kill-ing. Appellant expressed remorse, remarking that he felt rotten inside ... "it just eats you up every day." (ROT 956). Appellant felt he deserved life imprisonment but not death. Lastly, appellant pledged to do his utmost for self-rehabilitation. (We note that appellant attempted to enter pleas of guilty, also).

Appellant called Dr. Nelson, a psychiatrist, to the stand to testify that appellant was suffering from a transient situational disorder which was not of a permanent nature. Because of appellant's sincere motivation to readjust and his nonviolent history, Dr. Nelson was convinced that appellant could be rehabilitated with proper care during his confinement. Apparently, Dr. Nelson believed that the offenses were the result of extreme anxiety; Dr. Nelson cited the accused's past behavior, which evidenced no signs of a sociopathic individual (a sociopath being defined as one with less tendency to be rehabilitated since he has no feeling of guilt).

During aggravation, the government offered Prosecution Exhibit 18 which showed that appellant had received two prior nonjudicial punishments under Article 15, UCMJ, for disobedience of a lawful order from a noncommissioned officer and the theft of a fellow Marine's blanket. Prosecution Exhibit 19 was offered to establish appellant's prior summary court-martial conviction for an unauthorized absence of approximately one and one half months. No other evidence was offered in aggravation, but the government presented the testimony of Dr. Grigson, a psychiatrist from Texas who specialized in the criminal aspects of psychiatry and the law. Dr. Grigson's testimony was offered to rebut the testimony of Dr. Nelson regarding rehabilitation. Dr. Grigson totally disagreed with Dr. Nelson's diagnosis and testified that appellant was dangerous, would continue to kill, and could not be rehabilitated.

We note that the circumstances and nature of these offenses were previously described at length. After weighing these circumstances of the crime, appellant's background and record, his unsworn state-

ment, the testimony of psychiatric experts and the needs of the military society, all in the perspective of the noted objectives of sentence review, we are convinced that the sentence of death is most appropriate in this case.

Appellant was the moving, motivating force in a senseless, premeditated and cold-hearted murder of a fellow Marine. The apparent motive was an unpaid loan; regardless of its intended purpose, that money was callously and unnecessarily stained with PFC St. Onge's blood. Appellant solicited the aid of PFC Reyers as a co-conspirator and accomplice, and also attempted to solicit the aid of others in a cover-up of the crime. This aspect of the offenses demonstrates a cold cunning which represents a most dangerous threat to the military community. The manner in which the killing occurred is atrocious. The victim pleaded for mercy, yet none was forthcoming. In fact, appellant demonstrated a calculated vindictiveness which reduced an act of murder to the level of daily business. No remorse, whatsoever, was demonstrated until appellant faced trial and sentencing.

We have considered appellant's record, background and age. These factors do not demonstrate to us, as they did to Dr. Nelson, a reasonable likelihood for rehabilitation, nor do they evince an explanation for appellant's actions. Rather, the fact that appellant was an intelligent and motivated Marine supports our conclusion that he is a dangerous threat to society. To use one's talents and skills and to direct one's energies and motivations in the channels demonstrated by these offenses is an abomination of the highest magnitude. The deceptions, lies and machinations employed by appellant served to infect another Marine who, by all indications, had no such propensities. We cannot, after reviewing the entire record of trial, find any merit to appellant's arguments. Accordingly, Assignment of Error VI is dismissed.

We would note that disparity in sentences between co-conspirators is often the subject of consideration by intermediate sentence-reviewing authorities. That is, indeed, one aspect of review. *See United States v. Snelling, supra* at 268, and cases cited therein. Appellant's case is not, however, susceptible to a favorable application of this doctrine. The accused's position as motivator, perpetrator, solicitor and cruel cause of PFC St. Onge's death outweighs PFC Reyers' participation many-fold. Further, had PFC Reyers not voluntarily confessed and cooperated with authorities, these crimes may never have come to justice. Under these facts, appellant's sentence does not exceed the relative uniformity which our sentencing system strives to achieve, *see United States v. Snelling, supra* at 269; *United States v. Olinger*, 12 M.J. 458, 461 (C.M.A.1982); *United States v. Usry, supra;* nor does it rise to a level of an obvious miscarriage of justice or abuse of discretion. In this regard, we note the recent execution of a Texas prisoner whose accomplice in murder received a life sentence and will be eligible for parole as prescribed by statute. *See Branch v. Texas,* decided as companion case to *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

## ADEQUACY OF STAFF JUDGE ADVOCATE'S REVIEW

In *United States v. Brown*, No. 80 0457 (N.C.M.R. 29 August 1980), J. Gladis outlined the appropriate considerations for analysis of a staff judge advocate's review (SJAR). We find these guidelines most appropriate and applicable in the perspective of a capital case, as well.

Although the staff judge advocate has wide discretion in determining matters to be included in his review, his exercise of that discretion is subject to review for abuse. *United States v. Cruse,* 21 U.S.C.M.A. 286, 45 C.M.R. 60 (1972). An appropriate discussion of any point that might substantially influence the convening authority's action is required. A review that is incomplete or misleading on a significant factor is unacceptable. *Id.; United States v. McCadney,* 1 M.J. 732 (A.F.C.M.R.1975). The review should deal appropriately with any issue that could have determined the ultimate outcome of the case and contain all

pertinent information that might substantially influence the decision of the convening authority. *United States v. Williams,* 7 M.J. 725 (A.C.M.R.1979). The purpose of the review is to assist the convening authority in the exercise of his statutory responsibility to approve only such findings of guilty and sentence as he finds correct in law and fact and as he in his discretion determines should be approved. Article 64, UCMJ, 10 U.S.C. § 864. *United States v. Williams, supra.* This purpose cannot be fulfilled, and Article 61, UCMJ, 10 U.S.C. § 861, which mandates the review, is meaningless, unless the review provides the convening authority with lucid guideposts for deciding issues which he is required to decide. *United States v. Hagen,* 9 M.J. 659 (N.C.M.R.1980). *See generally, United States v. Morrison,* 3 M.J. 408 (C.M.A.1977).

We have carefully examined the 63 page review, with specific attention directed to asserted shortcomings noted by appellant. The review carefully summarizes the evidence and discusses it in light of the charged offenses. Various motions and objections made by appellant were discussed, including the constitutionality of the death penalty, the nature of defense objections to presentencing instructions, the judge's ruling on a motion *in limine* regarding PFC Reyers' testimony, the photographs of the deceased, and a defense request to call Dr. Halleck as a psychiatric witness. The staff judge advocate also noted the disparate sentences received by appellant and his co-conspirator, PFC Reyers. The review, when coupled with the detailed defense *Goode*[7] response, reflects an accurate and adequate advice which guides the convening authority in his statutory duty of review. *See United States v. Briggs,* No. 81 1541 (N.M.C.M.R. 30 October 1981). Regarding appellant's remaining contention that the staff judge advocate was bound to respond to issues raised by the defense in their *Goode* analysis, we specifically adopt the approach enunciated in *United States v.*

*Barbarick,* No. 80 0352 (N.C.M.R. 28 April 1980), of testing for prejudice on a case by case basis. Finding no such prejudice in this case, we dismiss Assignment of Error V as without merit.

## USE OF PSYCHIATRIC TESTIMONY REGARDING APPELLANT'S LONG TERM FUTURE BEHAVIOR.

During sentencing appellant made an offer of proof regarding the testimony of Dr. Nelson, a qualified expert in psychiatry. According to counsel, Dr. Nelson would testify that appellant could be rehabilitated. The military judge noted that Dr. Nelson's testimony would open the door for a rebuttal witness, and advised appellant that, should a rebuttal witness testify for the government, appellant could have a surrebuttal witness present to hear the government testimony. Dr. Nelson testified as an expert in forensic psychiatry and, based upon a 90 minute personal interview and the results of two psychiatric examinations,[8] diagnosed appellant as suffering a transient situational disorder, not a psychosis. Curiously, Dr. Nelson testified that his profession could not accurately predict future dangerousness. He then testified that persons who did not suffer from psychosis or schizophrenia, mental disorder of high magnitude, are less likely to be rehabilitated, but noted that he is reluctant to so diagnose a person because "then you just have to wipe them off the books." (ROT 890–910).

After Dr. Nelson's testimony, the government announced its intention to call Dr. Grigson to rebut Dr. Nelson's testimony. Government counsel requested a report of Dr. Nelson's examination and diagnosis as well as the results of the psychometric tests administered to appellant and employed in Dr. Nelson's diagnosis. Appellant opposed those requests, and the military judge did not order their production. Appellant also indicated an intention to call a witness in surrebuttal.

---

**7.** *See United States v. Goode,* 1 M.J. 3 (C.M.A. 1975).

**8.** Minnesota Multiphase Personality Inventory (MMPI) and an "SCL–90" were the tests administered to appellant.

Dr. Grigson established extensive credentials and lengthy experience in the field of criminal psychiatry; appellant did not object to the witness' qualifications as an expert. Dr. Grigson elaborated upon the details of a psychiatric examination and the foundation for his opinion concerning appellant. The witness had interviewed 16 Marines familiar with appellant, read the offense report and several NIS reports, read sworn statements from various witnesses, the unsworn testimony of the accused, the psychiatric examination of PFC Reyers, the autopsy and pathology reports, as well as various letters written by different individuals. Dr. Grigson also examined appellant's service and medical records. Based on this data, which Dr. Grigson described as the most extensive information ever made available for his diagnosis, the witness testified that appellant could not be rehabilitated. He disagreed with Dr. Nelson's diagnosis of transient situational disorder (Dr. Grigson had studied Dr. Nelson's in-court testimony in detail) and testified that appellant was a sociopath of the highest degree with no chance whatsoever for rehabilitation during confinement or by any other means. During cross-examination, defense counsel established that Dr. Grigson had testified in nearly sixty capital cases in which the accused received a death sentence. Counsel then addressed the contents of professional literature which opposed Dr. Grigson's testimony in capital cases, including reference to an American Psychiatric Association (APA) brief before the Supreme Court which stated that predictions of future dangerousness are fundamentally of low reliability. Dr. Grigson explained that he disagreed with this opinion which he felt was held by a small percentage of the APA membership. The remainder of cross-examination addressed the details of Dr. Grigson's research, examination of and foundation for his opinion and attacked the credibility of his diagnosis, *vis a vis* noted professional standards of psychiatric practice. Nowhere did defense counsel object to Dr. Grigson's testimony on the grounds of insufficient foundation, or incompetency, nor did appellant ever move to strike Dr.

Grigson's testimony. Appellant did, however, wish to call another witness to testify on the professional merits of Dr. Grigson's testimony. *See* Assignments of Error III, Opportunity to Rebut Expert Psychiatric Testimony.

■ Appellant now challenges the testimony of Dr. Grigson on two grounds:

(1) The government failed to establish a sufficient foundation for Dr. Grigson's expert testimony on future dangerousness of the accused; and,

(2) The subject matter of Dr. Grigson's testimony, the long-term future dangerousness of appellant, is inherently unreliable and should therefore be ruled inadmissible, not only here, but in all courts-martial.

At trial appellant did not object to Dr. Grigson's qualifications as an expert witness in the field of criminal psychiatry; nor was there objection to Dr. Grigson's testimony regarding future behavior on the ground that his opinions were based on scientific principles which are not generally accepted in the scientific community. The appellant did not object to the foundation of the witness' opinion nor did appellant object on the ground that Dr. Grigson was not competent to testify. Rather, defense counsel employed an intelligent and piercing cross-examination of Dr. Grigson to impeach his credibility which focused upon the foundation of the witness' opinion and the reputation of future-dangerousness-predictability in the psychiatric community. Failure to object under these circumstances constitutes waiver of the asserted errors. MRE 103(a); 702; *see* Drafters Analysis, MRE 702. If appellant had, however, preserved these issues for our consideration with a formal objection at trial, we still could not agree with his contentions.

Appellant first asserts that Dr. Grigson did not have sufficient foundation to render his expert opinion admissible for three reasons:

(a) Dr. Grigson's ignorance of various studies related to future dangerousness predictions raises questions about his qualifications as an expert;

924

(b) Dr. Grigson's willingness to diagnose appellant without a personal interview or investigation of his background is contrary to accepted psychiatric practice;

(c) The range of information used by Dr. Grigson was too narrow to form a competent and reliable opinion.

Mil.R.Evid. 702 requires that a witness who seeks to testify as an expert must first be found to be qualified as such by "knowledge, skill, experience, training, or education." Determination of expert qualifications is a matter for the military judge, Mil.R.Evid. 104(a), and his decision will not be overturned in the absence of clear abuse of such discretion. For pre-MRE cases, see *United States v. Fields,* 3 M.J. 27 (C.M.A. 1977); *United States v. Hagelberger,* 3 USCMA 259, 12 CMR 15 (1953); *United States v. Oakley,* 28 CMR 451 (ABR 1959); paragraph 138e, MCM. Some federal cases which address expert qualifications and the wide latitude of a trial judge to so determine include, *Soo Line Railroad Co. v. Fruehauf Corp.,* 547 F.2d 1365, 1374 (8th Cir. 1977); *Fernandez v. Chio's Shipping Co., Ltd.,* 542 F.2d 145, 153 (2d Cir.1976); *United States v. Lopez,* 543 F.2d 1156 (5th Cir. 1976). The expert who is called need not be an "outstanding practitioner," but need only be a person whose testimony will aid the jury. *See e.g. United States v. Barker,* 553 F.2d 1013 (6th Cir.1977); *Jenkins v. United States,* 307 F.2d 637 (D.C.Cir.1962). A number of cases have ruled that an expert need not have complete knowledge about the field in question, *see Weinstein's supra* ¶ 702[04], page 702–28, but as noted in *Jenkins,* a criminal case involving an insanity defense, the court must look beyond the mere title "psychologist," lest the jury be misled into relying on opinions which are not based on relevant learning and experience. *Jenkins v. United States, supra* at 644–646.

■ We believe that Dr. Grigson was properly presented to the members as an expert, qualified in the specialized skill of criminal psychiatry by extensive time and experience, education, and knowledge.

Factors noted by appellant regarding Dr. Grigson's lack of knowledge of certain articles relating to his testimony go only to the weight of his testimony in this instance. *See United States v. Fountain,* 2 M.J. 1202 (N.C.M.R.1976). Defense counsel did an admirable job of bringing this issue to the member's attention during cross-examination as a method of impeaching Dr. Grigson's credibility. That is, of course, a proper and encouraged practice, *see Lawrence v. Nutter,* 203 F.2d 540 (4th Cir.1953); *United States v. Marymount,* 28 CMR 904 (AFBR 1958); paragraph 138e, MCM, but it does not in this instance create a circumstance which would overcome the trial judge's discretion to rule in the area of expert qualifications. We would also note that failure to object to Dr. Grigson's qualifications is another factor which detracts from appellant's argument. *See United States v. Oakley, supra.* Accordingly, the first of appellant's assertions regarding Dr. Grigson's foundation to testify is without merit.

■ Appellant also addresses Dr. Grigson's failure to personally interview appellant as a condition precedent to his diagnosis and testimony. Analysis of factors necessary to predict future dangerousness often stress the importance of an interview or observation of the subject, but there is no definite requirement of a personal interview or observation. *See Estelle v. Smith,* 451 U.S. 454, 464 n. 8, 101 S.Ct. 1866, 1873 n. 8, 68 L.Ed.2d 359 (1981). Where an accused refuses to submit to examination, a personal interview does not become a necessary portion of an expert opinion foundation, *United States v. Bunting,* 6 USCMA 170, 19 CMR 296 (1955). In a case quite similar to this, the Air Force Court of Military Review upheld the testimony of a rebuttal psychiatrist who did not personally interview the accused. *United States v. Robinson,* 2 M.J. 1241 (A.F.C.M.R.1976). We specifically adopt our Brother's analysis in *Robinson* in the case *sub judice. See also United States v. Allen,* 7 M.J. 345 (C.M.A.1979). We would note, further, that some serious questions may arise under circumstances where an accused first presents expert psychiatric

testimony in his own behalf on the issue of future dangerousness and then refuses to be examined by a government psychiatrist. Some federal courts have carefully left open the possibility that an accused may be precluded from introducing such evidence under these circumstances. *See Estelle v. Smith, supra* 451 U.S. at 466 n. 10, 472–73, 101 S.Ct. at 1874 n. 10, 1878. Under such circumstances, not present in this case, where the government is not afforded the broad range of information necessary for rebuttal, we may find a rule of preclusion attractive.

■ Thirdly, appellant asserts that Dr. Grigson's range of information was too narrow to form a competent and reliable opinion. The broad range of Dr. Grigson's information was noted earlier. The restrictive circumstances surrounding further inquiry have also been documented. Under basic principles controlling expert testimony, cited earlier, we do not find error as argued. Again, this factor merely goes to the weight which members may afford Dr. Grigson's testimony. *See generally United States v. Allen, supra; United States v. Robinson, supra.* Accordingly, appellant's challenge to the competency and foundation of Dr. Grigson's testimony does not meet a level necessary for its exclusion.

■ Appellant also asserts that psychiatric predictions concerning future dangerousness are so inherently unreliable that they should not be admitted in any court-martial, especially capital cases. Dr. Grigson was not propounding some novel theory of psychiatry which requires general acceptance in the scientific community before receiving judicial sanction. *See e.g. United States v. Martin,* 13 M.J. 66 (C.M.A.1982); *United States v. Irvin,* 13 M.J. 749 (A.F.C. M.R.1982). The issue of future dangerousness and propensities for rehabilitation were initiated by appellant when Dr. Nelson was called to the stand. A review of Dr. Nelson's testimony, as well as Dr. Grigson's, establishes that such diagnoses are an integral part of their profession. Predisposition and propensities for future behavior are an important element of every level of

judicial decision regarding sentencing, parole or clemency. It is the concentrated study of human behavior and the resultant ability to effectively predict its manifestations that makes the science of psychiatry an important, and expert, aid to the triers of fact. We note in this vein that Texas' capital punishment statute requires the jury to specifically address the very issue of an accused's future danger to society. *See* Texas Code Criminal Procedure Ann., Art. 37.071(b)(2) (Supp. 1975–76); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). In that regard, Dr. Grigson has often testified in the courts of the State of Texas with the explicit approval of judicial authorities. *See Estelle v. Smith, supra.* Although some commentators urge a formulation of standards for the use of such testimony, it has never been proposed that testimony of future dangerousness be excluded entirely. *See generally, People v. Murtishaw,* 29 Cal.3d 733, 175 Cal.Rptr. 738, 631 P.2d 446, 470 (1981); Dix, *Clinical Evaluation of the "Dangerousness" of "Normal" Criminal Defendants* 66 Va.L.Rev. 523 (1980) (summary of studies criticizing psychiatric testimony regarding future dangerousness); Crump, *Capital Murder: The Issues in Texas,* 14 Hous.L.Rev. 531 (1977); Dix, *The Death Penalty, "Dangerousness," Psychiatric Testimony, and Professional Ethics,* 5 Am.J.Crim.L. 151 (1977).

The use of psychiatric testimony during the presentencing phase of a capital trial is valid where the experts are properly qualified to the satisfaction of the trial judge and the members are adequately apprised of the factors surrounding that testimony which may affect its credibility or competency. That was clearly the case here. Again, of special importance is the fact that appellant initiated this form of testimony. He cannot now be heard to complain, or to argue against the theory of his presentencing case, merely because the government rebutted with similarly effective testimony. As is the design of the military system, the members were in the best position to weigh the respective assertions. Accordingly, we find Assignment of Error II to be without merit.

## OPPORTUNITY TO CHALLENGE AND REBUT PSYCHIATRIC TESTIMONY IN THIS CASE.

After the rebuttal testimony of Dr. Grigson, appellant moved for a continuance to obtain a surrebuttal witness, Dr. Halleck. Counsel stated Dr. Halleck's eminent qualifications in forensic psychiatry and proffered the gist of his expected testimony. Briefly, Dr. Halleck was expected to challenge the competency and professional status of Dr. Grigson's testimony and discuss issues which were addressed on cross-examination of Dr. Grigson, as noted in our discussion of the preceding issue. The military judge found Dr. Halleck's proffered testimony irrelevant, commenting that the witness' testimony would merely put psychiatry on trial as two experts clashed on diagnostic theories. Noting that this consideration was aptly emphasized by cross-examination of Dr. Grigson, the military judge denied appellant's request for a continuance to secure Dr. Halleck. Appellant now asserts that the military judge abused his discretion by not granting the continuance and thus foreclosing Dr. Halleck from testifying. We disagree.

■ For reasonable cause, a military judge may grant a continuance to any party for such time and as often as may appear to be just. Article 40, UCMJ, 10 U.S.C. § 840; see paragraph 58, MCM. A continuance should not, however, interfere with the orderly prosecution of the case. See *United States v. Qualls,* 9 M.J. 662, 664 (N.C.M.R. 1980), and cases cited therein. Authority to grant or deny a continuance is within the sound discretion of the military judge. *United States v. Menoken,* 14 M.J. 10 (C.M.A.1982), and cases cited therein. Generally, the trial judge should weigh the prejudice to a party's substantial rights, based on the nature of the matter concerned in the request, with the orderly prosecution of the case. Where there is good cause for the request, the military judge should be liberal in granting the relief of continuance. *United States v. Dunks,* 1 M.J. 254 (C.M.A.1976); *United States v. Daniels,* 1 USCMA 52, 28 CMR 276 (1959).

It is well within the authority and discretion of the trial judge to exclude proposed testimony which is collateral to the issues at trial. See Mil.R.Evid. 403. Evidence which is cumulative may also be excluded. See *United States v. Tangpuz,* 5 M.J. 426 (C.M.A.1978). An accused's substantial rights cannot be prejudiced where irrelevant or collateral matters are excluded; rather, potential confusion of the issues is reduced when irrelevant matters are excluded. See generally Mil.R.Evid. 403; *United States v. Ruggerio,* 1 M.J. 1089 (N.C.M.R.1977), pet. denied, 3 M.J. 117 (C.M.A.1977). Several cases hold that where other expert testimony is available, denial of a request for a continuance is not an abuse of discretion. See *United States v. Thomson,* 3 M.J. 271, 273 (C.M.A.1977), and cases cited therein.

■ Under these principles, we believe the military judge's ruling to deny a continuance to obtain Dr. Halleck's personal testimony was well within his discretion. The proffered testimony of Dr. Halleck was cumulative of matters addressed during the cross-examination of Dr. Grigson. Dr. Halleck's testimony had no relevance to appellant's particular sentencing. We agree with the trial judge that Dr. Halleck's testimony would merely put the status of psychiatry on trial, an issue clearly collateral, irrelevant and potentially confusing to the members. Appellant was early aware of potential surrebuttal issues and was afforded several opportunities to submit stipulations on the testimony of more available experts to emphasize the defense theory of incompetent testimony addressed during Dr. Grigson's cross-examination. Under these circumstances, we cannot find any abuse of discretion which prejudices appellant's substantial rights.

Appellant also asserts that the principle of *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), was violated when the request for a continuance was denied and Dr. Halleck's testimony was excluded. We disagree. The pertinent holding of *Lockett* addressed by appellant states that in all but

the rarest capital cases, the sentencer must not be precluded from considering, as a mitigating factor, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. *Id.* 438 U.S. at 604, 98 S.Ct. at 2964. The Supreme Court was explicit in stating that "[n]othing in [their] opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of the case." *Id.* at 604 n. 12, 98 S.Ct. at 2965 n. 12. The military judge's ruling regarding Dr. Halleck's testimony clearly falls within this traditional authority. Accordingly, Assignment of Error III is dismissed.

## CONSTITUTIONALITY OF THE DEATH SENTENCE PROVISION OF ARTICLE 118, UCMJ.

■ Appellant asserts that the provisions of the Eighth Amendment, as interpreted by *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), apply to courts-martial procedures and, therefore, argues that the capital sentencing provisions under Article 118, UCMJ, are unconstitutional. We agree with appellant's initial assertion that the Eighth Amendment, as well as *Furman* and its progeny, apply to the provisions of Article 118, UCMJ. We disagree, however, that this premise renders Article 118, UCMJ, unconstitutional.[9] *See generally Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958); *United States v. Matthews,* 13 M.J. 501, 520–33 (A.C.M.R.1982); Article 55, UCMJ, 10 U.S.C. § 855.

■ Death has historically and socially been a permissible punishment which is not *per se* cruel and unusual punishment pro-

hibited by the Eighth Amendment. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In *Furman v. Georgia, supra,* the Supreme Court clearly recognized that a death penalty is constitutionally distinguishable from other punishments in its nature and application. In order to avoid a violation of the Eighth Amendment's prohibition against cruel and unusual punishment, therefore, the sentencing authority considering capital punishment must be given sufficient guidance to avoid the freakish and wanton application of capital punishment which creates a substantial risk that it would be inflicted in an arbitrary and capricious manner. *See Gregg v. Georgia, supra* at 188, 96 S.Ct. at 2932, citing *Furman v. Georgia.*

To comply with *Furman,* then, sentencing procedures for capital punishment should not create a substantial risk that the death penalty will be inflicted in an arbitrary and capricious manner. *Furman* does not require that all sentencing discretion be eliminated, but only that it be directed and limited so that a death penalty would be imposed in a more consistent and rational manner and so that there would be a meaningful basis for distinguishing the cases in which it was imposed from the many cases in which it was not. *Lockett v. Ohio,* 438 U.S. 586, 601, 98 S.Ct. 2954, 2963, 57 L.Ed.2d 973 (1978). Rejecting mandatory death penalties as a response to *Furman,* the Supreme Court has further elaborated that in order to ensure the reliability, under the Eighth Amendment standards, of the determination that death is appropriate punishment in a specific case, the sentencing process must permit consideration of the character and record of the individual offender and the circumstances of the particular of-

---

9. We shall not address the applicability of the principles of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), to purely military offenses which carry a death sentence or crimes carrying a mandatory death sentence in times of war. *See* Articles 94, 99, 100, 102 and 104, UCMJ, 10 U.S.C. §§ 899, 900, 902, 904, (crimes capital at all times), and Articles 85, 90, 101, 106 and 113, UCMJ, 10 U.S.C. §§ 885, 890, 901, 906, 913 (crimes capital during times of war). *See also United States v. Matthews,* 13 M.J. 501, 525 n. 16 (A.C.M.R. 1982); *Dawson, Is the Death Penalty in the Military Cruel and Unusual?,* 31 Jag.J. 53 (1980). We note, however, that the death sentence for rape, Article 120, UCMJ, 10 U.S.C. § 920, has been abrogated by the Supreme Court in *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1978).

928

fense as a constitutionally indispensable part of the process of inflicting a death penalty. *Woodson v. North Carolina,* 428 U.S. 280, 304–05, 96 S.Ct. 2978, 2991–92, 49 L.Ed.2d 944 (1976).

 The issue therefore, is, does the military justice system for capital sentencing under Article 118, UCMJ, provide sufficient guidance of the sentencing authority's discretion in terms of the individual character of the accused and circumstances of the offense, to prevent a substantial risk that death will be imposed in an arbitrary and capricious manner and to establish a meaningful basis for distinguishing the cases in which it is imposed from the many cases in which it is not? After considerable reflection, we believe that several factors inherent in military justice sentencing procedures provide sufficient guidance for sentencing authority discretion to meet the requirements of *Furman* and its progeny. Mere comparison of literal statute provisions, upheld as satisfactory under *Furman,* with military procedures is an insufficient analysis. These statutes, and the cases addressing their constitutionality, provide pertinent guidelines, but the military system of capital sentencing under Article 118 must be viewed in its entirety. Some of the guidelines discernable from these cases include:

(1) A mandatory death sentence is impermissible;

(2) Sentencing authority discretion must be guided in some manner which:

(a) prevents substantial risk of arbitrary and capricious infliction of the death penalty;

(b) provides a meaningful basis for distinguishing capital cases from noncapital ones;

(3) This discretion may be guided in a number of ways if the circumstances of the offense and the character of the offender become focal points for sentencing authority consideration;

(4) Some forms of guided discretion, which must be balanced and weighed as factors by the sentencing authority, include:

(a) designating certain aggravating factors of the offense which society, via its legislative representatives, deem particularly meriting capital punishment;

(b) designating certain mitigating factors of an offense or an accused's character which individualize the offense.

(5) Certain procedures have been found acceptable for guiding, and even enhancing, the exercise of a sentencing authority's discretion:

(a) A bifurcated trial is favored because it allows a more comprehensive basis for sentencing by relaxing the rules of evidence and allowing an accused to present mitigating evidence at sentencing which might have been determined inadmissible during his case on the merits;

(b) Aggravating circumstances may be found at either phase of trial;

(c) The sentencing authority must be permitted to consider *all* relevant mitigating factors, whether statutorily enunciated, or not;

(d) The trial judge must provide instructional guidance reflecting the above-noted aggravating and mitigating factors, as well as the proper means for weighing these factors in sentence determination; and

(e) A mandatory appeal system, designed to safeguard against arbitrary, disproportionate or inconsistent sentencing, is favored.

(6) These factors are designed for operation in a system where juries are inexperienced in criminal justice, sentencing and deciphering sentencing information; they are designed to overcome the noted "vagaries" of civilian juries which raised questions of racial, hierarchial, and economic overtones in the imposition of death penalties.

*See generally United States v. Matthews, supra* at 525–26. In summary, the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a system which ensures that the sentencing authority

is given adequate information and guidance. As a general proposition, these concerns are best met by a bifurcated system where the sentencing authority is apprised of information relevant to the imposition of sentence and provided standards to guide its use of the information. Each system must, however, be examined against these background guidelines on an individual basis. *Gregg v. Georgia, supra,* 428 U.S. at 195, 96 S.Ct. at 2935.

■ The death penalty is imposed and administered in the military justice system under procedures established by Congress and the President in the UCMJ and MCM, respectively. The duties to promulgate such procedures are a direct outgrowth of constitutional duties to establish and maintain the armed forces, and the peculiar requirements which flow from a disciplined, ever-ready and effective military community. *Burns v. Wilson,* 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953); Art. I, section 8, clauses 14 and 18, U.S. Constitution.

Accordingly, Article 118, UCMJ, states *inter alia:*

Any person subject to this chapter who, without justification or excuse, unlawfully kills a human being, when he—

(1) has a premeditated design to kill;
. . .

(4) is engaged in the perpetration or attempted perpetration of burglary, sodomy, rape, robbery, or aggravated arson;

is guilty of murder, and shall suffer such punishment as a court-martial may direct, except that if found guilty under clause (1) or (4), he shall suffer death or imprisonment for life as a court-martial may direct.

The specific terms of Article 118 narrowly restrict and define certain classes of homicide offenses before the sentencing authority may consider a death penalty. As noted in *United States v. Matthews, supra* at 526 n. 18, this definition of capital homicide, requiring premeditation as an aggravating element, is more restrictive than any addressed by the Supreme Court, and serves to narrowly focus the sentencing authority's

discretion to award a death penalty. *See United States v. Matthews, supra* at 526, citing *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

We believe that the military justice system goes a large step farther towards narrowing and restricting sentencing authority discretion with well-established, functionally designed pre-trial referral procedures, akin to civilian prosecutorial stage functions. Before trial, a civilian prosecutor has virtually unfettered discretion in determining who will be charged with a capital offense. *See Gregg v. Georgia, supra* 428 U.S. at 199, 96 S.Ct. at 2937; *Proffit v. Florida,* 428 U.S. 242, 254, 96 S.Ct. 2960, 2967, 49 L.Ed.2d 913 (1976); *Jurek v. Texas, supra* 428 U.S. at 274, 96 S.Ct. at 2957. The existence of objective standards, apart from the statutory limitations which define the types of crimes which would authorize the death penalty, to guide the exercise of his discretion is wholly lacking. We further cannot ignore the fact that a civilian prosecutor is a political person, and thus, subject to the pressures which can be manifested through community outrage and emotion. The influence of such "constituency" pressure on his referral decision cannot perhaps be measured, but we do perceive its existence. In the military system, the authority who must make the referral decision, that is, the convening authority, is normally the senior officer present within that military community affected by the crime. His decision is not subject to the pressure of the ballot box or the force of community emotion. By virtue of his years of service, experience, and command, he is trained to reach decisions of momentous import in a dispassionate and reasoned manner. Further, he has the benefit of receiving a formal report of investigation of the charges, as complete a report of the character and background of an individual accused, as well as extenuating and mitigating factors relevant to the offense and offender, as that accused is willing to submit, the recommendations and endorsement of intermediate levels, and the legal advice of his staff judge advocate to assist him in reaching his

decision. Each of these steps and procedures, and the information and evidence thus conveyed, serves to filter emotion from facts of the crime and thus results in an objective referral decision, rather than one predicated on the "hue and cry" of the community.

Specifically, before an offense may be referred to a general court-martial as a capital offense, a formal investigation must be conducted by an impartial and mature officer. Article 32, UCMJ. Extensive procedural requirements for an Article 32 investigation afford a military accused many more protections than his civilian counterpart which eventually result in a more informed, and consequently non-arbitrary, referral as a capital offense. See paragraph 34, MCM. For instance, unlike a grand jury proceeding, an accused in the armed services has the right to be personally present and to be represented by qualified counsel, the right to confront and cross-examine the witnesses against him, and the right to present matters in defense, extenuation or mitigation at an Article 32 investigation. This right of an accused is of critical importance. *Woodson* requires that evidence to extenuate or mitigate an offense, including background and character evidence pertaining to an accused, be submitted *only* to the sentencing authority in a capital case. In the civilian jurisdictions, this opportunity, of course, arises only *after* the initial decision of the prosecutor to try the case as capital has been made. In the military system, an accused has the unique right to influence, by presentation of *Woodson*-type evidence at an Article 32 investigation, the capital referral decision itself.

The pretrial investigating officer must reduce the results of the investigation and his recommendation to a formal report, noting summarized testimony for both parties which support or detract from his recommendation. *Id.* The convening authority's staff judge advocate must then separately review the investigation results and prepare formal advice. Paragraph 35*b* and *c*, MCM. Then, the convening authority makes his referral, much in the nature of a restrained, good-faith exercise of prosecutorial discre-

tion. *United States v. Hardin,* 7 M.J. 399, 404 (C.M.A.1979). Thus, the referral process apprises the convening authority of matters in aggravation, extenuation and mitigation before the case is submitted to the court. This informed and unique process serves to limit the number and class of cases referred as capital even further, and thus, as a necessary corollary, remove the discretion of the sentencing authority by the nature of the referral. *See* Paragraphs 15*a*, 126*a*, MCM.

A trial by court-martial is bifurcated. During the findings portion of the trial, the court must find the element of premeditation beyond a reasonable doubt. Similar to the procedure approved in *Jurek,* this aggravation factor may then be employed in the sentencing portion of trial. *United States v. Matthews, supra* at 526; *see generally* paragraph 74, MCM.

After conviction, an involved and well-established presentencing procedure begins. The government may present a case in aggravation essentially limited to: service data from the charge sheet, (age, pay, duration and nature of pretrial restraint), *see* paragraph 75*b*(1), MCM; personal data and character of the accused's prior service, (marital status and dependents, reports reflecting past military efficiency, conduct, performance, and evidence of any prior disciplinary actions), *see* paragraph 75*b*(2), MCM; evidence of prior convictions (convictions need not be similar to the offense, must be within a six year period of the present offense, and must be final), *see* paragraph 75*b*(3); and, any evidence of the actual crime as noted in findings, *see* paragraph 75*b*(4), MCM. The defense has the right to inspect any such material upon request. *See* paragraph 75*b*(5). We would note that the type of evidence which can be offered in aggravation in military cases is more limited than civilian capital cases. *See Smith v. United States,* 551 F.2d 1193 (10th Cir.1977), *cert. denied* 434 U.S. 830, 98 S.Ct. 113, 54 L.Ed.2d 90 (1977); *United States v. Boles,* 11 M.J. 195, 198 n. 5 (C.M.A. 1981).

The defense may then present a wide variety of matters in extenuation and mitigation. An accused may rebut any aggravation evidence. *See* paragraph 75*c*(1), MCM. Any matter which serves to explain the circumstances surrounding the offense or may serve to lessen the punishment is admissible. *See* paragraph 75*c*(1)(a) and (b), MCM. The accused may make a sworn or unsworn statement in extenuation, mitigation or rebuttal. *See* paragraph 75*c* (2)(a)(b) and (c), MCM. During presentencing procedures, the rules of evidence are relaxed to permit the introduction of letters, affidavits, certificates of military and civil offenses, and other writings of similar authenticity and reliability. *See* paragraph 75*c*(3), MCM.

Relevant considerations which are important in determining a legal, appropriate, and adequate punishment are outlined in paragraph 76, MCM. These considerations are required to be reflected in appropriate sentencing instructions from the military judge to the members, which include the maximum authorized punishment and voting procedures (a death sentence in the military requires a unanimous vote), and which are tailored to the facts and circumstances. *See* paragraph 76*b*, MCM. Examples of matters in aggravation, extenuation and mitigation are listed throughout the noted Manual provisions, and are also mandatory matters to be instructed upon by the military judge.

Following trial, an accused is afforded an extensive review of findings and sentence which is unsurpassed in the civilian community. These procedures are described in detail in *United States v. Matthews, supra* at 527–29. We need not, therefore, tread over this ground again. The Army Court of Military Review ably argues how the above noted procedures clearly meet the standards of *Furman* and its progeny. We agree with that analysis explicitly, emphasizing two additional factors which we believe lend weight to our conclusion: pretrial procedures, as noted earlier, and the qualifications of a court-martial member as opposed to a civilian juror.

The inexperience of civilian jurors in reaching sentencing decisions and their unskilled assessment of sentencing information were underlying factors behind the concern expressed in *Furman* with arbitrary and capricious death sentences. The character of civilian juries therefore played a large part in the formulation of several plurality opinions in *Furman*. This concern is not, however, applicable to military tribunals. Court members are the military analog of civilian fact-finders: the sentence is a military sanction on misconduct and is imposed by contemporaries in the military profession. *United States v. Temple,* 11 M.J. 687 (N.M.C.M.R.1981). Members must reach a consensus on a fair penalty, and this consensus is grounded in a panel of members chosen under the auspices of Article 25(d), (e), UCMJ, 10 U.S.C. § 825(d, e), which states, *inter alia:*

> [T]he convening authority shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service and judicial temperament.

This standard establishes a level of qualification for a military sentencing authority far distinct from that governing civilian jury selection. Military members are not inexperienced in sentencing; they regularly sit as court-martial members, act as convening authorities, summary courts-martial and investigating officers, and when in command, they impose nonjudicial punishment. Selection is not random, and members are explicitly aware of, or experienced in, military justice procedures.[10] *See United States v. Matthews, supra* at 527 n. 19. The asserted vagaries of civilian juries are not present in the military. *See Schick v. Reed,* 419 U.S. 256, 260, 95 S.Ct. 379, 382, 42 L.Ed.2d 430 (1974); *United States v. Den-*

---

**10.** Members of the military are provided regular, extensive, and formal education in the operations and principles of military justice. *See* Law Education Program for Commissioned Officers, SECNAVINST 1520.7C; Administration of Naval Justice and Related Legal Matters, CNETINST 5810.1A.

**932**

son, 588 F.2d 1112, 1119 n. 6 (5th Cir.1979); see generally Brookshire, *Jury Selection Under the Uniform Code of Military Justice: Fact and Fiction,* 58 Mil.L.Rev. 71 (1972). In consequence of the statutory standard for court member selection, as well as the other factors recited, there exists less necessity to guide the exercise of a military court member's discretion than that of his civilian counterpart. The above noted standards established by the Code, the Manual, and judicial interpretation in this perspective are sufficient to meet constitutional "muster."

Therefore, based upon the analysis noted in *United States v. Matthews,* and additional considerations which we have noted, we believe that Article 118, UCMJ, and the concomitant sentencing procedures established by Congress and the President, provide a constitutional means for assessing a penalty of death. Analysis of instructions to the members during sentencing, as well as other issues discussed throughout our decision leads us to the conclusion that these procedures were properly employed in this instance and afforded appellant that due process to which any accused is entitled.

Having examined the record of trial for further errors which may have prejudiced the substantial rights of the appellant, we have found none. Assignment of Error IX is summarily dismissed. Accordingly, the findings and sentence as approved on review below are affirmed.

Judge KERCHEVAL and Judge BARR concur.