**UNITED STATES**

v.

**Leman L. HUTCHINSON, Jr., 257 90 7904, Lance Corporal (E–3), U.S. Marine Corps.**

**NMCM 82 0203.**

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 22 June 1981.

Decided 22 April 1983.

---

MAJ James P. Axelrod, USMC, Appellate Defense Counsel.

LCDR Georgia L. Winstead, JAGC, USNR, Appellate Defense Counsel.

LCDR Michael R. McGuire, JAGC, USN, Appellate Government Counsel.

LT Steven P. Benson, JAGC, USNR, Appellate Government Counsel.

Before ABERNATHY, Senior Judge, and BARR and MALONE, JJ.

ABERNATHY, Senior Judge:

■ Contrary to his pleas, appellant was convicted at a general court-martial composed of officer and enlisted members of: two separate conspiracies to commit murder and three separate conspiracies to commit robbery; premeditated murder and felony murder; robbery; and, solicitation to commit robbery and solicitation to commit murder; in violation of Articles 81, 118, 122, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 918, 922, and 934, respectively. Appellant was sentenced to reduction to E–1, total forfeitures, and death. By implication, a sentence to death carries a dishonorable discharge. Paragraph 126a, *Manual for Courts-Martial, 1969 (Rev.)* (MCM).

Appellant was stationed at Camp Lejeune, North Carolina. During the month of January 1981, appellant decided that he wanted to kill PFC McCrae, basically because he did not like McCrae, he thought it would be an easy way to steal money from McCrae, and he wanted to use McCrae's rifle card to obtain a Marine Corps issue rifle for his own use. Appellant's friend, LCPL Haught, agreed to join him in this venture. The two of them conceived a plan whereby they would lure McCrae through a fake drug deal out to an ammo dump in the woods, appellant would shoot McCrae, and they would both then bury the body. McCrae, however, was not interested in their drug deal. Undaunted, appellant and Haught decided to seek out other criminal ventures. On payday night, 30 January 1981, they were joined by PVT Spencer and rode around Camp Lejeune in appellant's Mustang looking for hitchhikers to rob. The addition of PVT Spencer brought success to this venture: Spencer "punched out" two hitchhikers, obtaining $20 from the first, and a watch and $7 from the second. The proceeds of these transactions apparently did not satisfy appellant and Haught for too long, as three days later they set up a plan to assault and rob PFC Morton in the woods at night. Appellant jumped Morton from behind a tree and the plan would have succeeded, but Morton fought off appellant. Appellant identified himself to Morton and said it was just a joke, an explanation then accepted by Morton. Up to this point, appellant's adventures in crime had not been

particularly rewarding, but on 6 February 1981 he hit upon a grandiose idea. Appellant told seven Marines in his Company that he knew a drug dealer who was selling marijuana for $100 a pound. Four Marines each gave appellant $100 with the understanding that one of them, PFC Gunter, would meet appellant and the drug dealer that night to consummate the deal. Appellant approached Haught with the scheme of killing Gunter in the woods, burying his body, leaving Gunter's car (which Gunter had borrowed from one of the other three Marines) at the bus station, thereby making it appear that Gunter had gone UA with the drugs, and then appellant and Haught could split the $400. Haught replied that it was okay with him as long as he would not have to do the killing or see any blood. This was the substance of a conversation leading to the taking of a human life. Unfortunately for appellant and Haught, things once again did not go quite according to plan. Appellant drove his Mustang to the Verona Loop area of the base, where he was to allegedly set up the deal, and Gunter and Haught were to follow an hour or so later. Appellant waited in the bushes with a 12 gauge shotgun and then shot Gunter as planned, but the shot merely grazed Gunter's shoulder. Gunter fled back towards his car screaming "Oh God, Oh Hutch, Don't", but appellant caught up with Gunter and fired another blast from his shotgun. This shot, although it propelled Gunter into the open car and caused his innards to protrude through the wall of his abdomen, still did not instantaneously kill Gunter. Haught and appellant pulled the moaning Gunter from the car; Haught punched Gunter in the face to stop him from moaning; Haught, upon appellant's instruction, took Gunter's wallet; and then Haught, when given the shotgun with the advice from appellant "it is all set," fired a final shot directly into Gunter's face. Appellant and Haught seemed to have been overwhelmed by this sequence of events because they then both fled in appellant's Mustang. Appellant thereafter had the presence of mind to return for Gunter's car, which he then attempted to wipe clean be-

fore leaving it at a nearby grocery store. The course of events then flowed in predictable and logical fashion: the body was found two hours later by hunters; appellant's Mustang had been seen at the scene; the police traced the Mustang to appellant; appellant authorized a search of his house which uncovered the shotgun; and Haught then confessed (albeit a self-serving and not totally truthful confession).

In return for his guilty plea, Haught received a pretrial agreement limiting his sentence to fifty years. He was not obligated to testify at appellant's trial, but he did so under a grant of immunity. Based upon his testimony and the other extensive evidence produced by the government, we are convinced that, with the exception of the charge of conspiracy to rob Gunter, appellant is guilty beyond a reasonable doubt of the offenses as found by the general court-martial. Appellant raises fourteen assignments of error, which we shall discuss in the order assigned.

I

Appellant's first assignment of error is that his challenges for cause against prospective member Captain Peche, who was later peremptorily challenged by the defense, and against members Major Plantz and Gunnery Sergeant Maddox were improperly denied. It is our conclusion that the military judge did not abuse his discretion in determining that these three individuals could sit as fair and impartial members. As background, we would note that the military judge conducted a painstaking, careful, and attentive member selection. He allowed counsel wide latitude in examining the members, and he allowed seven defense challenges for cause. The military judge's concern for the magnitude of the member's *voir dire* and selection is self-evident by the detailed and conscientious manner in which *voir dire* was conducted.

■ Captain Peche made a statement to the effect that he would place the burden on appellant to show why the death penalty should not be imposed. Upon questioning

by the military judge and trial counsel, however, he clarified this statement to indicate that he did indeed have an open mind and that he would not make a decision until all the evidence was in and he had heard the other members' views. He stated he could see himself voting for life imprisonment. The Court of Military Appeals held in *United States v. Tippit,* 9 M.J. 106 (C.M.A.1980), that the test for inelastic attitude toward imposition of sentence is whether the member's attitude is of such a nature that he will not yield to the evidence presented and the judge's instructions. Under this standard, it is clear to us that Captain Peche is not an individual uncommonly willing to condemn a man to death; rather, since he was willing to consider all of the penalties provided by law, we find that he was not irrevocably committed before the trial had begun to vote either for or against the death penalty, regardless of the facts or circumstances. As such, Captain Peche was qualified to sit as a member.

■ After the panel had been selected and seated, Major Plantz revealed on his own initiative to the Staff Judge Advocate that he felt that Gunnery Sergeant Maddox might be an improper member because he had a tendency to act impetuously on occasion. Questioned on this statement in Court, Major Plantz revealed that he had been Gunnery Sergeant Maddox's commanding officer for approximately seven months, and that he felt that although Maddox was a competent noncommissioned officer, he had a tendency to say things before he thought them through. Major Plantz stated that he had counseled Maddox concerning this deficiency, but in his opinion Maddox, who had the nickname "Mad Dog", sometimes tried to live up to his image. Despite these tendencies, Major Plantz felt he could listen to Maddox and accept his point of view where appropriate. He felt that Gunnery Sergeant Maddox would be a competent member and he had confidence that he would be his own man on the jury. Major Plantz also stated that he had overheard Maddox talking to another noncommissioned officer telling him that he could not really see himself being select-

ed to the jury because of his hardness. Plantz indicated that this had happened in the time frame before Maddox was accepted as a member. Based on the above dialogue, it is the defense assertion that Major Plantz could not follow instructions, that he would not be able to listen to Maddox during deliberations, and that he would in all probability chill or inhibit Gunnery Sergeant Maddox. It is the defense assertion that Maddox was also unable to follow instructions, and that, furthermore, he was inelastic and biased. It is our conclusion that the entire *voir dire* of Major Plantz and Gunnery Sergeant Maddox, coupled with the above dialogue, does not support any of these allegations. The defense chose not to recall Gunnery Sergeant Maddox for further *voir dire* although invited by the military judge to do so. The fact that Major Plantz was of the opinion Maddox was hardheaded does not support the interpretation that he must necessarily be inelastic or biased. Major Plantz stated he did not believe that Maddox would have any problem in expressing his thoughts despite the fact that the Major had found it necessary to counsel him in the past. Major Plantz affirmed that he could listen to Maddox's opinions in deliberations and evaluate them as he would those of any other member. Neither Major Plantz's conversation with the Staff Judge Advocate nor Gunnery Sergeant Maddox's conversation with the noncommissioned officer can arguably provide a basis for challenge on the grounds that they could not follow instructions. The military judge certainly did not think so, and it is his instructions—to the effect that the members were not to discuss the *case* with anyone—that were allegedly violated.

Appellant urges us to disregard the clarifications and explanations of these three members and take the statements favorable to the defense point of view at face value. Appellant, citing *United States v. Harris,* 13 M.J. 288 (C.M.A.1982), asks us to follow the rule that where it is apparent a potential member has an actual or implied bias against the accused and is challenged on

that ground, the military judge is abusing his discretion in relying on the member's assertion, in response to standard *voir dire* questions, that he could be fair and impartial. In *Harris,* however, there were other facts of record which raised the question of implied bias: 1) the challenged member was president of the court and wrote or endorsed the fitness reports of three other members of the court; 2) the challenged member worked with two of the victims of appellant's larcenies and he discussed these crimes with them prior to trial; and 3) the challenged member, as chairman of a committee on base responsible for securing areas against loss, had an official interest in discouraging larcenies such as appellant's. From such a basis of facts, we cannot advance a broad general theory, as appellate defense counsel would have us do, that *voir dire* responses can't be used as a basis to deny a challenge. Furthermore, in the instant case, there are no such extrinsic facts to plainly overcome and impeach these members' assertions. The *voir dire* in the instant case was exceptionally detailed and exhaustive in its effort to insure the empanelling of a fair and impartial court. The purpose of *voir dire* generally is to delve into the members' attitudes, and the responses taken as a *whole* are the only means by which a trial judge can make his decision. It is apparent to us from the record of this trial that these members had an open mind about the case they were about to try. *See United States v. Tippit, supra.*

Lastly, the appellant, again citing *Harris,* maintains the military judge abused his discretion in allowing him only one peremptory challenge. Appellant understands *Harris* to imply that if a challenge for cause is improperly denied, and then that member is peremptorily challenged, error might be present if it is clear that the party desired to peremptorily challenge a different member. Regardless of what *Harris* may or may not imply, there is no error in the instant case since the challenge for cause against Captain Peche was correctly denied. *See United States v. Boyd,* 7 M.J. 282 (C.M. A.1979). An accused, furthermore, is enti-

tled to only one peremptory challenge. Article 41(b), U.C.M.J., 10 U.S.C. § 841(b); Paragraph 62e, MCM; *United States v. Calley,* 46 C.M.R. 1131 (A.C.M.R.1973), *affirmed on other grounds,* 22 U.S.C.M.A. 534, 48 C.M.R. 19 (1973).

## II

During the course of the trial on the merits, the military judge permitted the defense counsel to cross-examine LCPL Haught as to the terms of his pre-trial agreement, including the sentence limitation of fifty years. The military judge allowed this evidence for the limited purpose of impeaching Haught's credibility. During the sentencing portion of the trial, the defense counsel once again desired to litigate Haught's credibility as reflected by the fifty year sentence limitation. The military judge, reasoning that the members already knew more than they needed to know about Haught's sentence, ruled that the defense counsel was free to argue the matter of Haught's credibility, but could not argue the fifty year sentence limitation, since that would get into the impermissible area of sentence disparity. During the course of his argument, the defense counsel stated "there is evidence before the court that the only participant in the crime at Verona Loop who is being tried for his life is LCPL Hutchinson." (R. 1300). Since this clearly seemed to the military judge to be an indirect message to the members that Haught had received less than the death penalty, he instructed the members "not to consider the sentence in any other particular trial." (R. 1317). Appellant asserts that the military judge erred in the above ruling and instruction since the issues of credibility and disparity were of particular relevance in determining an appropriate sentence.

 We reject these assertions. Even if Haught's credibility was still a relevant issue, and we do not believe that it was, there were, nonetheless, sufficient facts before the members to review Haught's credibility without considering his sentence.

Appellant had been given ample exploratory latitude to probe Haught's credibility on the merits, of which the fifty year sentence limitation was only one portion. The members were still free to reconsider that, in order to get his pretrial agreement approved, Haught retracted his original claim of having been forced to Verona Loop at gunpoint, that he had at first told the NIS case agent that appellant had fired the final shot, and that Haught admitted he had not told the truth during his providence inquiry. Having the members consider the one additional fact of the fifty year sentence limitation would have added little to help make a determination of Haught's credibility. Furthermore, such a ruling would have allowed defense counsel to bring in through the back door what he could not bring in through the front door: a comparison of Haught's sentence with what the members were considering for appellant. It is appellant's contention that Haught's sentence was relevant to the issue of whether death was an appropriate punishment for appellant. The law on this issue, however, is well decided: the sentence a co-conspirator receives is not a proper consideration at trial. *United States v. Anderson,* No. 79 1931 (NCMR 4 July 1980); *United States v. Raggins,* No. 78 1258 (NCMR 25 September 1979). *See also* paragraph 72*b,* MCM. Appellant cites *United States v. Olinger,* 12 M.J. 458 (C.M.A.1982) as authority for his position; that decision however, is limited to comparisons of sentences on review.

### III

■ Despite appellant's contentions to the contrary, we specifically find the record of trial to be verbatim and complete. No matter affecting a substantial and material right of appellant was omitted. The out-of-court conferences objected to by appellate defense counsel, aside from the fact that they dealt with immaterial matters, were either adequately summarized on the record, or were waived by defense counsel's failure to object when given the opportunity to do so. *See United States v. Eichenlaub,* 11 M.J. 239 (C.M.A.1981); *United States v. Lashley,* 14 M.J. 7 (C.M.A.1982);

*United States v. Perry,* 12 M.J. 920 (N.M.C. M.R.1982). Furthermore, all documents required to be attached to the record were so appended. *See United States v. Barnes,* 12 M.J. 614 (N.M.C.M.R.1981).

### IV

■ Although the military judge adequately advised the appellant of his counsel rights under Article 38(b), UCMJ, the military judge failed to ask appellant whether he desired to *then* (at the time of the inquiry) exercise his right to an individual military counsel. Appellant now contends this failure was error, in light of the mandate of *United States v. Donahew,* 18 U.S. C.M.A. 149, 152, 39 C.M.R. 149, 152 (1969), that the record must "contain the accused's personal response to direct questions incorporating each of the elements of Article 38(b) as well as his understanding of his entitlements thereunder." A reading of the record of the instant case, however, clearly indicates that appellant, who was in the company of two civilian counsel in addition to his detailed military counsel, understood the general rights granted him under Article 38(b) and especially the option to be represented by individual military counsel. If the failure of the military judge to elicit a response from the appellant as to his desires regarding individual military counsel was error, it was harmless error in light of the fact that he had been advised of and he adequately understood his options. *United States v. Turner,* 20 U.S.C.M.A. 167, 43 C.M.R. 7 (1970); *United States v. Copes,* 1 M.J. 182 (C.M.A.1975).

### V

■ Appellant's fifth assignment of error is that he was denied due process and equal protection by being convicted by a nonunanimous vote of a panel composed of only six members. Appellant additionally asserts that the potential variation in the number of members sitting in courts-martial violates equal protection principles. These arguments have been offered before this and other Courts of Military Review and have

been dismissed. *See United States v. Rojas,* 15 M.J. 902 (N.M.C.M.R.1983), and citations listed therein.

## VI

On the day before evidence on the merits was to begin, twenty-seven days after the trial had commenced, defense counsel moved for a three week continuance in order that appellant could be examined by Dr. Halleck, a forensic psychiatrist, who would not be available until the expiration of this period of time. The defense counsel represented that appellant was unresponsive to his questions, unable to assist in his defense, and, consequently, the defense lawyers were unable to prepare a defense. The military judge refused to grant the continuance requested by the defense; however, he did order that another MCM Paragraph 121 Board be conducted on appellant by a different psychiatrist than the one who had conducted the previous 121 Board ordered by the convening authority. This was done, and the results of the Board were made available to the defense counsel a few days later. The military judge told defense counsel that, regardless of the results of the 121 Board, they were free to pursue whatever they wished insofar as a civilian forensic psychiatrist was concerned. Once the results of the 121 Board were published to the defense, the defense evidently decided not to pursue the obtaining of an examination by a forensic psychiatrist because, when asked by the judge what they would do next, the defense responded they were willing to proceed on the merits. Appellant asserts on this appeal that the judge's refusal to grant the defense-requested delay to consult with Dr. Halleck was an abuse of discretion amounting to prejudicial error.

■ The decision to grant or deny a continuance rests within the sound discretion of the military judge and his decision will not be overturned absent a clear abuse of discretion. *United States v. Menoken,* 14 M.J. 10 (C.M.A.1982). It is clear from the record that no such abuse is present here. The case on the merits was scheduled to begin the next day, there were thirty-four witnesses scheduled to be called, many of them civilians and many who had to travel great distances. The military judge allowed an overnight recess to see what could develop, and when it became clear that no forensic psychiatrist was going to be available sooner than Dr. Halleck, he ordered the 121 Board. This was a reasonable compromise in light of the fact that appellant has neither a right to a forensic psychiatrist nor a right to pick who will sit on a sanity board. The military judge did not preclude a later examination by Dr. Halleck or any other forensic psychiatrist, but simply was not prepared to delay the proceedings at that late date for such an examination. It would appear that Dr. Halleck was available prior to or shortly after the end of the trial; yet appellant made no offer of proof that he had been examined by Dr. Halleck or that the results of such an examination would be contrary to that of the 121 Board. We can find no possible prejudice to the appellant as a result of the judge's ruling; accordingly, we find the military judge did not abuse his discretion. Furthermore, if there ever was an issue here, it was waived by the defense failure to pursue the matter any further.

## VII

■ In his seventh assignment of error, appellant challenges the constitutionality of UCMJ Article 118. Appellant argues that under *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), his death sentence must be set aside because: 1) the court-members were allowed unfettered discretion in imposing the death penalty; and 2) the Government was not required to prove any aggravating circumstances. This assertion was recently rejected by this Court in *United States v. Rojas, supra;* therefore, we need not address it again.

## VIII

■ Charge I, specification 3 alleges a conspiracy between appellant and LCPL Haught to rob PVT Gunter. The evidence of record to support this allegation was Haught's testimony on direct examination

that he and appellant had agreed to rob and murder PVT Gunter on the night in question at Verona Loop. On cross-examination, however, Haught clarified this statement, and in effect, retracted it. Haught went on to testify that since appellant was already in possession of Gunter's $100 for the one pound of marijuana, there was no plan to actually "rob" Gunter. Their plan in going to Verona Loop was to shoot Gunter in order that the two of them could keep the $400 given them for the purported drug deal. At no time did he and appellant have an agreement to take Gunter's wallet. From the foregoing, it is clear to us that Haught's initial use of the word "rob" was inartful—he and appellant obviously could not conspire to rob Gunter of the $100 which they already possessed. The decision to take Gunter's wallet seems to have been more an afterthought or a spur of the moment decision. Nothing had ever been verbalized between Haught and appellant regarding an intention to take Gunter's wallet until appellant so instructed Haught when Gunter lay moaning on the ground at Verona Loop. Appellant and Haught went out to Verona Loop with one agreement only, and that was to kill Gunter in order to keep the $400 marijuana money for themselves. Since Haught retracted his statement, which is the only evidence of record to support the allegation of conspiracy, the conviction of the conspiracy to rob Gunter cannot be sustained. *See* MCM, paragraph 74a (2). Accordingly, we grant appellant's eighth assertion of error, and set aside and dismiss the finding of guilty to specification 3 of Charge I.

### IX

Appellant asserts that the military judge erred by refusing to instruct the members on the lesser included offense of unpremeditated murder. Appellant argues that if the members were to have disbelieved Haught's testimony, they could have concluded that a real drug deal was taking place and that it went sour, shooting started, and Gunter was then somehow killed in the process.

There is no question that a military judge must instruct the members on all lesser offenses reasonably raised by the evidence. *United States v. Jackson,* 6 M.J. 261 (C.M.A.1979). In the instant case, however, appellant's contentions are not reasonably raised by the evidence. As Government appellate counsel correctly points out, one would have to indulge in a suspension of logic and common sense to reach such a conclusion or inference. If anything, these wild stabs in the dark by appellant would seem to raise a defense akin to alibi, rather than call for an instruction on unpremeditated murder. Had the members chosen to disbelieve Haught, they would have acquitted appellant. Since the evidence does not even reasonably raise the lesser included offense of unpremeditated murder, we accordingly dismiss this ninth assignment of error.

### X

In his tenth assertion of error, appellant contends he was denied his constitutional right to cross-examine four of the government witnesses. Appellant cites *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) and *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). To be sure, the Sixth Amendment to the U.S. Constitution affords an accused the right to full confrontation and cross-examination of witnesses against him as to all relevant subjects of inquiry. In the instant case, however, the defense counsel's line of questioning was not germane to any issue that had been raised by the evidence.

PFC [M], LCPL [V], and PFC [R] testified for the government on the merits that appellant had approached them individually on 6 February 1981 offering to sell them marijuana at $100 a pound. The defense counsel desired to cross-examine these three witnesses on their previous involvement with drugs. Defense counsel stated it was his purpose to show that the drug transaction allegedly being set up by appellant was legitimate, rather than bogus as alleged by the government. The military judge foreclosed the defense counsel from inquiring into the witnesses' past involve-

ment with marijuana, but ruled that defense counsel was free to recall the witnesses if he could provide evidence that this drug transaction was indeed legitimate. The defense, however, never did offer any such evidence. As was the military judge, we are at a loss to perceive the relevance of this line of questioning. These three witnesses were under the belief that they would be able to buy marijuana through the appellant at $100 a pound; the fact that these witnesses might have been involved in previous drug transactions is totally irrelevant to the issue of the bogus nature of this drug transaction and these witnesses' belief in its legitimacy.

▉▉ The fourth witness, LCPL [D], originally gave a statement to NIS that he had merely loaned appellant $100. After talking to the trial counsel, he then changed his statement to indicate that he gave appellant the $100 on 6 February 1981 for one pound of marijuana. Defense counsel attempted on cross-examination to ask LCPL [D] whether he had been given any promises against prosecution prior to making the second statement. The military judge disallowed this question because no foundation had been laid that prosecution was a possibility; however, the judge did allow the defense counsel to ask the witness whether any threats or promises had been made to him prior to the giving of this second statement. Appellant contends that the military judge erred in not allowing him to ask the question concerning promises against prosecution. The object of such a question, however, is to bring out the witness' bias or motive to misrepresent; by allowing defense counsel to ask whether *any* promises or threats had been made before he made the second statement, the impeachment of the witness was accomplished. Mil.R.Evid. 608(c). This assignment of error is, accordingly, rejected.

## XI

In this assertion of error, appellant contends that the trial counsel committed prejudicial error in his argument on sentence. Appellant specifically objects to the following two portions of trial counsel's rebuttal argument on sentence:

1) ... keep in mind that this accused has brought agony to another family as well. The GUNTERS' at Fort Worth, Texas, have lost a son and a brother. And how did they lose him? Did they lose him after a four week trial and the pleadings of three lawyers and all the applications of the military justice system? No, they lost him at the barrel of a shotgun. Did they lose him after a long round of tearful farewells? After thoughtful discussions with each other or thoughtful discussions with priest or pastor? No, they lost him before they ever knew it, at the barrel of a shotgun on Friday in February in the woods of Camp Lejeune. *Those of us who are fathers can sympathize perhaps with that.*

R. at 1304 (emphasis supplied).

2) ... that one thing is certain, gentlemen, and that is that this individual is a dangerous man and that danger could be stopped, that danger could be terminated, if the accused is sentenced to death.

*Id.*

▉▉ In regard to the first excerpt, appellant relies on *United States v. Shamberger,* 1 M.J. 377 (C.M.A.1976), where in a conviction for rape, the court held that a prosecutor's argument suggesting that the court-members put themselves in the place of the victim's family was inflammatory and constituted prejudicial error. Although we agree with appellant that trial counsel's concluding remark here was improper, we find it to be neither inflammatory nor prejudicial. In *Shamberger,* the trial counsel told the members to think of *their* wives: "picture your wife having her clothes ripped off and then being raped, once, twice, three times, four times, five times." In the instant case, however, trial counsel never made any such direct plea to the members that they should imagine one of their own relatives as the victim. As such, trial counsel's remark is bland and pale in comparison to the remarks of counsel in

*Shamberger.* The defense counsel objected to this remark at trial, but in light of the lengthy sentencing arguments and in light of the serious magnitude of appellant's crime, we doubt that trial counsel's remark could have had more than a minimal impact on the members. It was not so egregious as to have called for a cautionary instruction by the military judge, let alone the setting aside of the sentence by us.

 Defense counsel did not object to the second excerpt from trial counsel's argument at trial. Appellant now contends, however, that trial counsel was arguing facts not in evidence. Appellant argues that characterizing him as "a dangerous man" and urging the court-members to impose death to terminate "that danger" implies (1) that the appellant cannot be rehabilitated and (2) that the appellant, if not sentenced to death, would again commit offenses similar to those of which he was convicted. Appellant asserts the record is devoid of any evidence suggesting the likelihood of either event. It is well established, however, that counsel is permitted to argue any reasonable inferences from the evidence. *United States v. Doctor,* 7 U.S.C. M.A. 126, 21 C.M.R. 252 (1956); *United States v. Tanksley,* 7 M.J. 573 (A.C.M.R. 1979) *aff'd* 10 M.J. 180 (C.M.A.1980); *United States v. Campbell,* 8 M.J. 848 (C.G.C.M. R.1980). To characterize one who has been found guilty of premeditated murder, conspiracy to commit premeditated murder, robbery, and conspiracy to commit robbery as a "dangerous man" would seem to us a reasonable inference to draw. It is a little difficult for us to find misconduct or impropriety which compels reversal when it purportedly arises out of an argument which had so little impact on defense counsel, who had vigorously objected to other portions of trial counsel's arguments, that they sat silently by and failed to mention it to the military judge in a subsequent UCMJ Article 39(a), 10 U.S.C. § 839(a) session.

Accordingly, this assignment of error is rejected.

## XII

 Appellant asserts that the sentence to death is inappropriately severe. Article 66(c), UCMJ, 10 U.S.C. § 866(c), requires a Court of Military Review to disapprove any sentence which in view of the entire record is not fair and just. While it is recognized that sentencing is not an exact science and that we should strive for uniformity, the sense of justice of the community where the crime was committed should not be disturbed unless the harshness of the sentence is so disproportionate as to cry out for sentence equalization. *United States v. Usry,* 9 M.J. 701 (N.C.M.R.1980) *pet. denied* 9 M.J. 402 (C.M.A.1980). Our review of the record, in light of the guidelines established by *Usry,* convinces us that the sentence of death is most appropriate in the instant case.

Appellant was 21 years old at the time of the offense. He was raised in Georgia, where he had been active in sports and community activities. He was described by those who had watched him grow up as an honest, caring, and respectful person who was considerate of and had deep feelings for others. He was popular in high school and was characterized as being one of the best behaved students in school. Appellant had strong patriotic feelings for his country and entered the Marine Corps at age 17. At the conclusion of recruit training, appellant married, his wife later giving birth to a daughter. Appellant was characterized as a devoted family man. Appellant's three and one-half years of military service, however, were not exemplary. He accumulated three non-judicial punishments and one summary court-martial (for minor unauthorized absences and one specification of making a false official statement). His proficiency and conduct markings averaged 4.1 and 3.9, respectively. Appellant did, however, participate in several deployments, received a letter of commendation for his performance as an assistant navigator aboard the USS HERMITAGE, had high classification and assignment test scores, and successfully had completed a number of service schools and courses.

This background, however, does not demonstrate to us a propensity for rehabilitation in light of appellant's manipulations, scheming and planning over the space of a month to rob and kill his fellow Marines not only for the money, but also, it would seem, for the mere pleasure of it. Appellant never showed any remorse; in fact, appellant sought assurances from Haught after the killing of Gunter that Haught would not let this killing bother his conscience (R. 947). Appellant's actions can only be described as wanton, vicious, cruel, and depraved. He conspired to kill PFC McCrae in order to obtain McCrae's rifle card. After minimal success in his payday robberies, he managed to lure PVT Gunter into an isolated spot in the woods, where he hid in the bushes with a shotgun, and then shot Gunter with cold and calm premeditation. Although Gunter screamed and pleaded for mercy, appellant shot him again, and then gave the loaded shotgun to Haught so Haught, too, could fire a round into Gunter. To kill a fellow Marine with whom he had lived and worked for over a year in such a senseless, premeditated, and cold-blooded manner is an abomination of the highest magnitude. Such brutal and reprehensible conduct represents a most dangerous threat to the community. Military society, through the voice of the court-members, has expressed its "moral outrage" at appellant's crimes. The record reveals no reason to dispute that judgment. We reject out of hand the suggestion, made by appellate defense counsel during oral argument, that the murder is somehow mitigated by the fact that the victim did not have to suffer for very long between the first shotgun blast and the time he expired. We think the crime was committed in a manner appropriately characterized as a consummate example of man's inhumanity to man.

██ We would note that disparity in sentences between co-conspirators is often the subject of consideration by intermediate sentence reviewing authorities. *See United States v. Snelling,* 14 M.J. 267 (C.M.A.1982). Appellant's case, however, is not susceptible to a favorable application of this doctrine. Appellant's position as motivator, perpetrator, solicitor, and initiator of PVT Gunter's death outweighs LCPL Haught's participation many fold. Further, had LCPL Haught not cooperated with authorities, justice for PVT Gunter's death may never have been achieved. Haught's approved sentence of 50 years confinement at hard labor is not such a disparity that cries out for relief given the appellant's primary roles in the crimes. *See United States v. Snelling, supra* at 269; *United States v. Olinger, supra* at 461 (CMA 1982); *United States v. Usry, supra.* As we did in our recent decision of *United States v. Rojas, supra,* we again note the recent execution of a Texas prisoner whose accomplice in murder received a life sentence and will be eligible for parole as prescribed by statute. *See Branch v. Texas,* decided as a companion case to *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

### XIII

Appellant asserts that he was charged with seven specifications which arose from basically the same transaction:

1) conspiracy to murder Gunter

2) conspiracy to rob Gunter

3) premeditated murder of Gunter

4) murder while robbing Gunter

5) robbery of Gunter

6) solicitation of Haught to rob Gunter

7) solicitation of Haught to murder Gunter.

Relying on *United States v. Sturdivant,* 13 M.J. 323 (C.M.A.1982), appellant argues that since this is substantially one transaction, he has been prejudiced by an unreasonable multiplication of charges, and that the findings and sentence, therefore, should be set aside.

██ We disagree. It is a well-established principle of law that a solicitation, a conspiracy, and the substantive offense itself are separate and distinct criminal acts, and can, therefore, be separately prosecuted. *See e.g. United States v. Dunbar,* 12 M.J. 218 (C.M.A.1982). Although we agree with appellant that the specifications of

felony murder and premeditated murder are multiplicious for findings, we specifically find that these two specifications were properly pled for contingencies of proof. *See* paragraph 26*b,* MCM.

 The military judge found that for sentencing purposes the conspiracies to murder Gunter and to rob Gunter were multiplicious; the premeditated murder of Gunter, the felony murder, and the robbery of Gunter were multiplicious; and the solicitations to rob and murder Gunter were multiplicious. The military judge instructed the members accordingly. Absent any evidence to the contrary, it must be presumed that the members correctly followed and complied with the instructions of the military judge. *United States v. Ricketts,* 1 M.J. 78 (C.M.A.1975). We cannot, therefore, perceive any prejudice to appellant during sentencing.

The thirteenth assignment of error is, accordingly, dismissed.

### XIV

Appellant invites our attention to the errors as set forth by trial defense counsel in their response to the staff judge advocate's review. These asserted errors, however, were individually addressed by the staff judge advocate in his first endorsement to defense counsel's response. We concur with the staff judge advocate's treatment of the issues, and, furthermore, we specifically find upon a careful examination of both the staff judge advocate's initial review and his first endorsement to defense counsel's response that the convening authority was provided with accurate and adequate advice to guide him in his statutory duty of review. Accordingly, this assignment of error is dismissed.

For the reasons stated above, we conclude that the findings, with the exception of Charge I, specification 3, and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of appellant was committed. The finding of guilty to Charge I, specification 3 is set aside and dismissed; the remaining findings of guilty are affirmed. The sentence, upon reassessment, is likewise affirmed.

Judge BARR and Judge MALONE concur.